T.C. Memo. 2006-78

UNITED STATES TAX COURT

SID PAUL RUCKRIEGEL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

AL A. RUCKRIEGEL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21675-03, 21676-03.      Filed April 18, 2006.

Ps were each 50-percent shareholders in an S corporation that incurred ordinary losses before and during the years in question (1999 and 2000). They were also 50-percent partners in a partnership that advanced funds, both directly and indirectly (through Ps) to the S corporation in 1997-2000. The issue for decision is whether all or a portion of those advances resulted in loans from the partnership to Ps and from Ps to the S corporation, thereby providing Ps with sufficient bases in the S corporation, under sec. 1366(d)(1)(B), I.R.C., to permit each P to deduct his 50-percent share of that corporation's ordinary losses for the years in question.

<u>Held</u>: Only the partnership advances through Ps resulted in loans from the partnership to Ps and from Ps to the S corporation, and those advances provided Ps with sufficient bases in the S corporation to deduct

only a small portion of that corporation's 1999 ordinary loss and none of its 2000 ordinary loss.

Scott W. Dolson and Robert C. Webb, for petitioners.

Denise A. Diloreto and Mark D. Eblen, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  These consolidated cases involve the following determinations by respondent of deficiencies in petitioners' Federal income tax:

| Year | Al A. Ruckriegel | Sid Paul Ruckriegel |
|------|------------------|---------------------|
| 1999 | $110,544 | $107,064 |
| 2000 | 122,272 | 124,130 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts have been rounded to the nearest dollar.

The issue for decision is whether petitioners had sufficient bases in their S corporation,[1] Sidal Inc. (Sidal), during 1999 and 2000 (the audit years), under section 1366(d)(1)(B), to

---

[1]  The term "S corporation" is defined in sec. 1361(a)(1). In general, an S corporation has no Federal income tax liability, and its items of income, deduction, credit, and such are passed through to (i.e., taken into account by) its shareholders.  See secs. 1363(a), 1366(a).

permit each of them to deduct his pro rata share of Sidal's ordinary losses, to the extent of $329,797[2] for 1999 and $492,588 for 2000 (sometimes, the basis issue).[3]

The notices of deficiency contain certain other adjustments that are purely computational. Their resolution solely depends upon our resolution of the basis issue.

---

[2] The parties stipulate that Sid Paul Ruckriegel's (Sid's) 1999 deduction for Sidal's 1999 losses was $324,750, but Sid's 1999 return confirms that he reported a 1999 loss of $329,797 from Sidal. That is also the amount of the Sidal loss respondent disallowed in the notice of deficiency issued to Sid. Erroneous stipulations are not binding on this Court. See Gulf Oil Corp. v. Commissioner, 87 T.C. 135, 159-160 n.4 (1986), affd. 914 F.2d 396 (3d Cir. 1990). Therefore, we find that Sid's 1999 reported loss from Sidal is $329,797.

[3] In his notices of deficiency, respondent also made adjustments, pursuant to sec. 267(a)(2), increasing each petitioner's "passthrough" income from Sidal by $12,407 for 1999 and $37,233 for 2000 attributable to Sidal's disallowed deductions for interest owed to a related party. Respondent characterizes the adjustments, both on brief and in his notices of deficiency, as increases in each petitioner's interest income from Sidal. Although petitioners assign error to those adjustments in their petitions, they make no argument either in their trial memoranda or on brief concerning the adjustments. Consequently, we consider the adjustments to have been conceded by petitioners. See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001); Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988); Zimmerman v. Commissioner, 67 T.C. 94, 104 n.7 (1976).

## FINDINGS OF FACT[4]

Some facts have been stipulated and are so found. The stipulation of facts, with attached exhibits, is incorporated by this reference.

At the time the petitions were filed, petitioner Sid Paul Ruckriegel (Sid) resided in Peoria, Illinois, and petitioner Al A. Ruckriegel (Al) resided in Terre Haute, Indiana.

Sidal, Inc.

Sidal, an Indiana corporation, elected S corporation status at the time of its organization in 1993 and retained that status through December 31, 2000. During that period, petitioners were each 50-percent shareholders in Sidal. Sidal operated approximately 50 fast food franchise restaurants throughout Indiana and part of Illinois during the 1997-2000 period. From its incorporation in 1993 through 2000, Sidal operated at a loss. Sid and Al actively managed the Sidal restaurants.

Paulan Properties Partnership

From its formation, in 1993, through December 31, 2000, petitioners were each 50-percent partners of Paulan Properties Partnership (Paulan), a general partnership governed by Indiana

---

[4] To the extent that petitioners fail to object to respondent's proposed findings of fact, or vice versa, we conclude that those proposed findings of fact are correct except to the extent that the nonobjecting party's proposed findings of fact are clearly inconsistent therewith. See Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

law.  Paulan owns real property and leases it to several of the restaurants operated by Sidal, as well as to other restaurant operators.  Petitioners managed Paulan's properties.  From 1997 through 2000, Paulan operated at a profit.

Other Individuals and Entities Related to Paulan and Sidal

Lovella Ruckriegel (Lovella) and Robert Ruckriegel (Robert) are petitioners' parents.  Pursuant to the Paulan partnership agreement, control and management of Paulan were vested in Lovella.  As a practical matter, however, Lovella's duties consisted of receiving, depositing, and recording incoming cash and writing and recording checks on Paulan's behalf.

Robert and Lovella own the controlling interest in BR Associates, Inc., which provides financial advice, bookkeeping, secretarial, and administrative services to Paulan and Sidal. Larry Freyberger (Freyberger) works for BR Associates, Inc., with the title of controller, and he maintains Sidal's general ledger. His services on behalf of Paulan consist of receiving the check register from Lovella and computerizing the transactions recorded therein, using previously assigned account numbers.  He and his staff provide general bookkeeping services for Sidal and provide a trial balance[5] to an outside certified public accountant (C.P.A.) at yearend.

---

[5]  A trial balance (or adjusted trial balance) is a record taken from the books of account.  See Cooper & Ijiri, Kohler's Dictionary for Accountants 24, 514 (6th ed. 1983).

Ralph Michel (Michel) was the outside C.P.A., and he prepared tax returns for Paulan and Sidal for 1997, 1998, and 2000 and for petitioners for 1997-2000. He has been the principal tax adviser to petitioners since 1976 and to Paulan and Sidal since their formation in 1993. Ernst & Young (EY) prepared and compiled financial statements for Paulan and Sidal and prepared tax returns for those entities for 1999. EY did not audit the books of either entity.

Prior Audits and Tax Planning Discussions Between Michel and Petitioners

Respondent audited petitioners' 1995 and 1996 returns. A result of that audit was the denial of petitioners' deductions of Sidal's 1995 and 1996 losses on the ground that petitioners lacked bases in Sidal. Petitioners paid the deficiencies relating to the denial of those deductions. After that audit, Michel spoke with the Internal Revenue Service (IRS) agent who conducted the audit regarding the proper way to structure future loans to Sidal so as to enable petitioners to achieve bases in Sidal equal to the loan amounts. In 1997, after that conversation, Michel advised petitioners that loans to Sidal could be structured to obtain tax bases for them in Sidal, and he advised them regarding that structure. The 1997-2000 loans to Sidal were structured in accordance with Michel's advice. The IRS agent auditing petitioners' 1997 and 1998 tax years did not challenge petitioners' passthrough deductions of Sidal's losses

to the extent of petitioners' bases in Sidal attributable to (1) $1 million wire transfers from Paulan to each petitioner and from each petitioner to Sidal on November 24, 1997 (the wire transfer payments), and (2) a $200,000 capital contribution by each petitioner to Sidal on July 11, 1997.

Description of the Loans

On 11 occasions during the 1997-2000 period, Paulan transferred funds directly or indirectly (via the wire transfer payments) to Sidal.[6]  The bank loans that constituted the source of the funds, the transactions themselves, and the manner in which they were reflected in the financial statements of Paulan and Sidal are described as follows.

1997

Paulan Bank Borrowings

July 10 - $3,550,550.00 ($3.6 million less $49,450.00 in closing costs) from the Merchants Bank of Terre Haute, Indiana (Merchants Bank) (the $3.6 million Merchants Bank loan).

---

[6]  On their individual returns for 1997, petitioners each claimed a debt basis of $1 million in Sidal attributable to the wire transfer payments, and they deducted suspended Sidal losses from prior years.  As noted in the text, respondent did not challenge those deductions.  The amounts of basis attributable to those payments that carried over to 1999 are not certain.  A basis schedule for 1993-99, prepared by Michel, indicates a remaining 1999 basis from those payments of $5,065 for each petitioner, but petitioners' 1999 returns indicate a remaining basis of $5,064 for Al and $34,554 for Sid.  As discussed infra, respondent denies the existence of any post-1998 carryover basis under sec. 1366(d)(1)(B) attributable to the wire transfer payments.

July 10 - $1 million in the form of a revolving loan line of credit arrangement with Merchants Bank (the $1 million Merchants Bank loan).

Both the $3.6 million and the $1 million Merchants Bank loans were secured by assets of both Paulan and Sidal and guaranteed by Sidal, Robert, Lovella, and petitioners.

December 8 - $2 million from Merchants Bank (the $2 million Merchants Bank loan), secured by life insurance policies, securities, and Paulan real and personal property, and also guaranteed by Sidal, Robert, Lovella, and petitioners.

Paulan Payments

The July 11 Payment

On July 11, Paulan wrote a check to Sidal for $1.2 million. The source of that payment was the $3.6 million Merchants Bank loan. Sidal's adjusted trial balances for its taxable years ending December 31, 1997, 1998, 1999, and 2000, reflect the $1.2 million payment to it as giving rise to a note payable to Paulan. Correspondingly, Paulan's adjusted trial balances for its taxable years ending December 31, 1997 and 1998, reflect the $1.2 million payment to Sidal as giving rise to a note receivable from Sidal.[7] Sidal made principal and interest payments to Paulan on that note of $74,328 in 1997, $178,388 in 1998, $148,657 in 1999, and

_____

[7] Paulan's adjusted trial balances for its taxable years ending Dec. 31, 1999 and 2000, are not in evidence.

$193,253 in 2000.  No adjusting journal entries were made on any of the above-mentioned Paulan and Sidal trial balances to recharacterize either Paulan's July 11 payment to Sidal or any of the principal and interest payments by Sidal to Paulan as consistent with, first, loans by Paulan to petitioners and, then, loans by petitioners to Sidal.

The November 24 Wire Transfer Payments

The source of the wire transfer payments is not clear from the record.[8]  All of the Paulan and Sidal adjusted trial balances in evidence, beginning with the adjusted trial balances for the taxable year ending December 31, 1997, reflect the wire transfer payments as $1 million loans from Paulan to each petitioner and from each petitioner to Sidal.  Sidal made principal and interest payments directly to Paulan in connection with the wire transfer payments totaling $276,518 in 1998, $230,431 in 1999, and $299,561 in 2000.[9]

---

[8]  The parties stipulated that the source of the wire transfer payments were the $2 million Merchants Bank loan, which occurred on Dec. 8, 1997, 2 weeks after the wire transfer payments.

[9]  As noted, petitioners' claims of basis in Sidal, under sec. 1366(d)(1)(B), attributable to the wire transfer payments were not challenged by respondent in connection with the audit of petitioners' 1997 and 1998 returns.

1998

During 1998, Paulan wrote four checks to Sidal as follows:

| | |
|---|---|
| Jan. 20 | $100,000 |
| Feb. 17 | 200,000 |
| Aug. 25 | 18,000 |
| Oct. 27 | 650,000 |
| Total | 968,000 |

The source of those payments was the $1 million Merchants Bank loan.

Sidal's adjusted trial balances for the taxable years ending December 31, 1998, 1999, and 2000, reflect a note payable to Paulan in the sum of $928,000,[10] and Paulan's adjusted trial balance for the taxable year ending December 31, 1998, reflects a corresponding note receivable from Sidal. No adjusting entries were made on those trial balances to recharacterize Paulan's 1998 payments to Sidal, to the extent of $928,000, as Paulan's loans to petitioners and petitioners' loans to Sidal.[11] Handwritten

---

[10] There is no explanation in the record for the discrepancy between the total amount of the 1998 Paulan checks, $968,000, and the $928,000 note payable from Sidal to Paulan reflected on Sidal's adjusted trial balances.

[11] Although (1) a handwritten entry on Sidal's adjusted trial balance for its taxable year ending Dec. 31, 1999, indicates that the $928,000 note payable to Paulan was "reclassed by AJEs" (adjusting journal entries) and (2) Sidal's general ledger for 1999 reflects the elimination, on Oct. 19, 1999, of $928,000 as an intercompany note to Paulan, Sidal's adjusted trial balance for the following year (2000) still reflects the $928,000 as a note payable to Paulan as of Dec. 31, 2000.

entries on Sidal's adjusted trial balance for its taxable year ending December 31, 2000, show 2000 principal and interest payments on those loans of $67,213 and $111,175, respectively.

1999

On April 20, 1999, Paulan borrowed $250,000 from Bavaria, Inc., a C corporation, the stock of which is wholly owned by Robert and Lovella. On December 31, 1999, Paulan used the proceeds of that loan to write a check to Sidal for $250,000.

On November 12, 1999, Paulan borrowed $525,000 from Civitas Bank. That loan was secured by certain marketable securities and guaranteed by Robert and Lovella. On November 17, 1999, Paulan used the proceeds of that loan to write a check to Sidal for $525,000.

Although both Paulan's and Sidal's general ledgers for 1999 reflect the two advances as resulting in a $775,000 payable from Sidal to Paulan, adjusting entries were made on both entities' adjusted trial balances for the taxable year ending December 31, 1999, to change the $775,000 from a note payable by Sidal to Paulan to notes for $125,000 and $262,500 payable by Sidal to each petitioner and receivables by Paulan from each petitioner.

2000

On May 11, 2000, Paulan borrowed $1,350,000 from Old National Bank (formerly Merchants Bank).[12] The loan was secured, in part, by Paulan real property and guaranteed by Robert, Lovella, and petitioners. The loan was the source of the following three Paulan checks to Sidal written in 2000:

| | |
|---|---|
| Jan. 21 | $200,000 |
| Mar. 28 | 500,000 |
| Oct. 5 | 400,000 |
| Total | 1,100,000 |

Although Sidal's adjusted trial balance for its taxable year ending December 31, 2000, originally reflected a note payable to Paulan for $1.1 million, adjusting entries were made, as of December 31, 2000, to reflect, instead, notes payable to petitioners for $550,000 each.

The Promissory Notes

Sometime during the years 1997-2000, petitioners each executed promissory notes to Paulan, and Sidal executed promissory notes to each petitioner (collectively, the promissory

---

[12] Paulan applied for, and Old National Bank approved, a $1,750,000 loan. There is no explanation in the record for the $400,000 discrepancy between the loan applied for and approved and the actual amount of the loan.

notes), bearing the following dates of execution and in the following amounts:[13]

| Date | Sid to Paulan | Sidal to Sid | Al to Paulan | Paulan to Sid |
|---|---|---|---|---|
| 6/30/97 | $600,000 | $600,000 | $600,000 | $600,000 |
| 12/18/97 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| 10/31/98 | 464,000 | 464,000 | 464,000 | 464,000 |
| 4/20/99 | 125,000 | 125,000 | 125,000 | 125,000 |
| 11/12/99 | 262,500 | 262,500 | 262,500 | 262,500 |
| 1/31/00 | 100,000 | 100,000 | 100,000 | 100,000 |
| 3/31/00 | 250,000 | 250,000 | 250,000 | 250,000 |
| 10/31/00 | 200,000 | 200,000 | 200,000 | 200,000 |

The June 30, 1997, promissory notes predate the transaction to which they relate; i.e., Paulan's July 11, 1997, check to Sidal for $1.2 million.  Similarly, the April 20 and November 12, 1999, promissory notes predate the transactions to which they relate; i.e., Paulan's December 31 and November 17, 1999, checks to Sidal for $250,000 and $525,000 respectively.[14]

---

[13]  Thus, for each alleged effective date, there were four promissory notes (one each by Sid and Al to Paulan, and two by Sidal, one each to Sid and Al) in matching amounts.  With the exception of the notes dated Dec. 18, 1997, which correspond to the $1 million wire transfer payments, and the notes dated Oct. 31, 1998, each promissory note represents one-half of the amount of a check from Paulan to Sidal.  The notes dated Oct. 31, 1998, each represent one-half of $928,000.

[14]  The Apr. 20 and Nov. 12, 1999, promissory notes bear effective dates and amounts corresponding to Paulan's  borrowings

(continued...)

Directors and Partners' Minutes

### Sidal

For each Sidal promissory note, petitioners, in their capacities as the directors of Sidal, executed minutes of a "Special Meeting of the Board of Directors of Sidal, Inc.", which purported to be the minutes of a board of directors meeting to authorize (1) the borrowing from each petitioner and (2) the promissory note to each petitioner. In each case, the specified date of the board of directors meeting was the effective date appearing on the corresponding promissory notes.

### Paulan

Petitioners, in their capacities as the sole general partners of Paulan, executed "Minutes of the Special Meeting of the Partners of Paulan Properties" specifically authorizing the following loans: (1) the wire transfer payments reflected in the promissory notes of $1 million from each petitioner to Paulan, dated December 18, 1997, (2) the $250,000 check to Sidal, dated December 31, 1999, reflected in the promissory notes of $125,000 from each petitioner to Paulan, dated April 20, 1999, and (3) the $525,000 check to Sidal, dated November 17, 1999, reflected in the promissory notes of $262,500 from each petitioner dated November 12, 1999. The partners' minutes authorizing those three

[14](...continued)
of $250,000 on Apr. 20, 1999, and $525,000 on Nov. 12, 1999.

loans to petitioners reflect meeting dates of December 18, 1997, April 20, 1999, and November 12, 1999, the dates of petitioners' promissory notes.

Petitioners also executed partners minutes reflecting an April 1, 1997, meeting of the Paulan partners (a date prior to any of the Paulan bank borrowings or advances to Sidal or petitioners). Those minutes, in effect, provide advance authorization for any future Paulan loans to petitioners for the purpose of enabling them to relend the funds to Sidal and for those loans to take the form of direct payments to Sidal.

None of the Sidal or Paulan minutes described herein (collectively, the minutes) were drafted and executed earlier than June 2000, and the minutes describing an October 31, 2000, Sidal board of directors meeting were drafted and executed sometime after October 31, 2000.

Stock Basis

Petitioners' adjusted tax bases in their Sidal stock were zero as of January 1, 1999, 2000, and 2001.

OPINION

I. Introduction

Respondent disallowed each petitioner's deduction of his 50-percent share of Sidal's ordinary losses for 1999 and 2000 on the ground that petitioners had zero bases for their respective investments in Sidal. Each petitioner's basis in Sidal depends

on the characterization properly attaching to certain payments originating with Paulan, a partnership, and ultimately received by Sidal, an S corporation.  Those payments were made on various dates beginning in 1997 and ending in 2000 (the 1997-2000 payments).  In all but one instance, the 1997-2000 payments were made directly by Paulan to Sidal (the Paulan direct payments).  In that one instance (the wire transfer payments), payment by Paulan was made indirectly, through petitioners to Sidal.  The Paulan direct payments totaled $4,043,000, and the wire transfer payments totaled $2 million.  We must determine the extent, if any, to which the 1997-2000 payments provided petitioners with bases in Sidal.

II.  Burden of Proof

A.  Section 7491

In general, the taxpayer bears the burden of proving that the Commissioner's determinations in the deficiency notice are in error.  See Rule 142(a)(1).  Section 7491(a)(1) provides, however, that "[i]f * * * a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining * * * [the taxpayer's proper tax liability]", the burden of proof with respect to that issue shall be on the Commissioner.  See also Rule 142(a)(2).  Credible evidence is evidence the Court would find sufficient upon which to base a decision on the issue in favor of the taxpayer if no contrary evidence were submitted.

See Higbee v. Commissioner, 116 T.C. 438, 442 (2001); Bernardo v. Commissioner, T.C. Memo. 2004-199 n.6.  Section 7491(a)(1) applies only if the taxpayer complies with any substantiation requirements imposed by the Internal Revenue Code, maintains all required records, and cooperates with the Commissioner for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(A) and (B).  The taxpayer bears the burden of proving compliance with the conditions of section 7491(a)(2)(A) and (B).  H. Conf. Rept. 105-599, at 240 (1998), 1998-3 C.B. 747, 994.

B.  Arguments of the Parties

Petitioners argue that the burden of proof with respect to the basis issue shifts to respondent because they complied with all of the conditions of section 7491(a)(2) and presented credible evidence of sufficient bases in Sidal to sustain their passthrough deductions for the audit years. Although respondent concedes that petitioners complied with the record maintenance and cooperation requirements of section 7491(a)(2)(B), he argues that petitioners did not comply with the substantiation requirement of section 7491(a)(2)(A), and that, therefore, the burden of proof on the basis issue remains with petitioners. Respondent also argues that petitioners failed to introduce credible evidence of their bases in Sidal during the audit years.

C.  <u>Analysis</u>

1.  <u>The Paulan Direct Payments</u>

For reasons discussed <u>infra</u>, we agree with respondent that petitioners have failed to introduce credible evidence that the Paulan direct payments provided them with bases in Sidal during the audit years.  Therefore, it is unnecessary to address the issue of petitioners' compliance with the requirement of section 7491(a)(2)(A) "to substantiate any item" as it may apply to those payments.

Because we find that petitioners have failed to introduce credible evidence that the Paulan direct payments provided petitioners with basis in Sidal, we decide the basis issue as it relates to those payments in respondent's favor; i.e., the absence of credible evidence that petitioners acquired bases in Sidal by virtue of the Paulan direct payments necessarily means that petitioners cannot sustain their resulting burden of proof with respect to those payments.  See <u>Bernardo v. Commissioner</u>, <u>supra</u> n.7.

2.  <u>The Wire Transfer Payments</u>

Because we base our decision (discussed <u>infra</u>) regarding petitioners' bases in Sidal attributable to the wire transfer payments upon a preponderance of the evidence, assignment of the burden of proof under section 7491 is unnecessary.  See <u>FRGC Inv., LLC v. Commissioner</u>, T.C. Memo. 2002-276, affd. on this

issue 89 Fed. Appx. 656 (9th Cir. 2004); <u>Polack v. Commissioner</u>, T.C. Memo. 2002-145 n.7, affd. on this issue 366 F.3d 608, 613 (8th Cir. 2004).

III. <u>Petitioners' Bases With Respect to Sidal</u>

    A. <u>Principal Statutory Provisions</u>

    Section 1366(a)(1) provides that a shareholder of an S corporation shall take into account his pro rata share of the S corporation's items of income, loss, deduction, or credit for the S corporation's taxable year ending with or in the shareholder's taxable year. Section 1366(d)(1), however, limits the amount of such losses and deductions (without distinction, losses) that a shareholder may take into account for any taxable year to an aggregate amount not exceeding the sum of (1) his adjusted basis in the stock of the S corporation and (2) his adjusted basis in any indebtedness of the S corporation to the shareholder. Any losses so disallowed may be carried forward indefinitely. See sec. 1366(d)(2).

    B. <u>Summary of the Parties' Arguments</u>

    Petitioners contend that all of the 1997-2000 payments were, in substance, direct loans from them (one-half each) to Sidal that increased their debt bases in Sidal, under section 1366(d)(1)(B), by an amount sufficient to sustain the deductions for Sidal's operating losses reported on their returns for the audit years. Respondent contends that all of those payments were

interentity loans from Paulan to Sidal that did not increase petitioners' debt bases in Sidal, and that petitioners had zero bases in Sidal during the audit years.

C. Applicable Caselaw

1. Introduction

There are two types of payments at issue: (1) the wire transfer payments, which were made by Paulan to petitioners and, then, by petitioners to Sidal, and (2) the Paulan direct payments, which, in form, were made by Paulan directly to Sidal. In each case, for petitioners to prevail, the evidence must show that they, not Paulan, made loans to Sidal, and that Sidal's resulting indebtedness ran directly to them, not to Paulan. See, e.g., Prashker v. Commissioner, 59 T.C. 172, 176 (1972) ("[t]he key question is whether or not the debt of the corporation runs 'directly to the shareholder'".). A finding that Sidal's indebtedness ran to Paulan, a partnership with passthrough characteristics, rather than directly to petitioners, its partners, would not satisfy that requirement. See Frankel v. Commissioner, 61 T.C. 343 (1973), affd. without published opinion 506 F.2d 1051 (3d Cir. 1974). Moreover, the evidence must show that the payments created indebtedness from Sidal to petitioners on the dates of each payment to Sidal. Petitioners' subsequent recharacterization of those payments as back-to-back loans, through them, would not, on account of that recharacterization,

give petitioners any debt-financed bases in Sidal.  See <u>Underwood v. Commissioner</u>, 535 F.2d 309 (5th Cir. 1976), affg. 63 T.C. 468 (1975); <u>Bhatia v. Commissioner</u>, T.C. Memo. 1996-429; <u>Shebester v. Commissioner</u>, T.C. Memo. 1987-246; see also <u>Hitchins v. Commissioner</u>, 103 T.C. 711, 716-718 (1994).

### 2. <u>Paulan Direct Payments</u>

Because the Paulan direct payments were, in fact, payments from Paulan directly to Sidal (and Sidal repaid Paulan directly), petitioners must prove that Paulan, in making those payments (and in receiving the repayments), was acting on behalf of (i.e., as agent of) petitioners, who were the actual lenders to Sidal.  Put another way, petitioners must establish facts sufficient for us to draw the legal conclusion that, on account of the Paulan direct payments, Sidal was indebted to them, not to Paulan. Petitioners claim that it is Indiana law that governs whether a debtor-creditor relationship exists and, under Indiana law, intent governs.  Petitioners cite <u>Union Sec., Inc. v. Merchants' Trust and Sav. Co.</u>, 185 N.E. 150, 153 (Ind. 1933), in which the Supreme Court of Indiana set forth the test for distinguishing between a loan and a sale:  "The test which determines whether the real transaction between the parties was a loan or a sale is the intention of the parties, and their intention is to be ascertained from the whole transaction, including the conduct of the parties as well as their written agreement."  Intent is,

indeed, important.  We have said:  "Whether a transfer of money creates a bona fide debt depends upon the existence of an intent by both parties, substantially contemporaneous to the time of such transfer, to establish an enforceable obligation of repayment."  Delta Plastics Corp. v. Commissioner, 54 T.C. 1287, 1291 (1970).  We also agree with the Supreme Court of Indiana that the we must make an objective appraisal of intent.  See, e.g., Hubert Enters., Inc. & Subs. v. Commissioner, 125 T.C. 72, 91 (2005) ("The subjective intent of the parties to a transfer that the transfer create debt does not override an objectively indicated intent to the contrary.").  Thus, petitioners' beliefs are not necessarily determinative.  See, e.g., Bhatia v. Commissioner, supra (stipulated conclusory statements by sole shareholder of two S corporations in respect of bookkeeping entries evidencing shareholder's assumption of indebtedness running from one corporation to the other insufficient to establish bona fides of the transactions in question and their economic substance); Burnstein v. Commissioner, T.C. Memo. 1984-74 (testimony of sole shareholders of two S corporations that, when they caused one corporation to transfer money to the other, they intended and believed that they were actually transferring their own money is not relevant to the question of whether they actually incurred risk of nonrepayment).

Moreover, transfers between related parties are examined with special scrutiny. Hubert Enters., Inc. and Subs. v. Commissioner, supra at 91. In the circumstances of this case, where the entities involved in the transactions are wholly owned by petitioners, petitioners bear a heavy burden of demonstrating that the substance of the transactions differs from their form. See, e.g., Bergman v. United States, 174 F.3d 928, 933 (8th Cir. 1999). Nevertheless, "[t]he existence of a close relationship between the parties to the transaction `is not necessarily fatal if other elements are present which clearly establish the bona fides of the transactions and their economic impact'". Id. (quoting Bhatia v. Commissioner, supra). In Culnen v. Commissioner, T.C. Memo. 2000-139, revd. on another issue 28 Fed. Appx. 116 (3d Cir. 2002), the uncontradicted testimony was that the taxpayer had for many years used his controlled, profitable corporation as an incorporated pocketbook, having the corporation make payments on his behalf that were posted to the corporation's books as loans to the taxpayer, creating a loan balance, which, periodically, the taxpayer would liquidate by making payments to the corporation. We found that, in substance, the corporation's advances to a loss corporation (an S corporation) in which the taxpayer was a shareholder constituted economic outlays or payments on the taxpayer's behalf, thereby creating a tax basis for the taxpayer in the S corporation under section

1366(c)(1)(B).  We reached a similar conclusion in <u>Yates v. Commissioner</u>, T.C. Memo. 2001-280.

### 3.  The Wire Transfer Payments

In the case of the wire transfer payments, the issue is whether the payments were (1) in substance, as well as in form, back-to-back loans from Paulan to petitioners and from petitioners to Sidal or (2) direct loans from Paulan to Sidal, with petitioners serving as mere conduits for the transfer of funds.  If we find the latter to be the case, we must apply the so-called step transaction doctrine and ignore, as without independent legal significance, the same-day wire transfers from Paulan to each petitioner and from each petitioner to Sidal.  See <u>Aiken Indus. Inc. v. Commissioner</u>, 56 T.C. 925, 934 (1971) (doctrine applied to disregard an intermediate back-to-back loan designed to avoid the withholding of U.S. tax on interest payments to a foreign corporation).  If we ignore petitioners' participation in the transactions, as without legal significance, then, as in the case of the Paulan direct payments, the issue will be whether Paulan made funds available for the use of (and collected repayments of principal and interest from) Sidal as agent for or on behalf of petitioners.

D.  Discussion

    1.  The Economic Outlay Requirement

Respondent's principal argument is that petitioners failed to satisfy the requirement, referred to in a number of cases, e.g., Bergman v. United States, supra at 932; Hitchins v. Commissioner, 103 T.C. at 715, that an increased basis in an S corporation must entail an "actual economic outlay" by the shareholder taxpayer.  In respondent's view, that requirement is met only if the taxpayer invests in or lends to the S corporation his own funds, or funds borrowed from an unrelated party, to whom he is personally liable.  We reject that view.  As we made clear in Yates v. Commissioner, supra, and Culnen v. Commissioner, supra, the fact that funds lent to an S corporation originate with another entity owned or controlled by the shareholder of the S corporation does not preclude a finding that the loan to the S corporation constitutes an "actual economic outlay" by the shareholder.

It is not unusual for an individual to conduct multiple businesses through multiple entities, some or all of which are passthrough entities (e.g., S corporations or partnerships).  Nor is it unusual for one or more of those entities to be profitable and one or more to be unprofitable.  Where the loss entity is an S corporation, we find no categorical rule, under section 1366(d)(1)(B), the regulations thereunder, see sec. 1.1366-2(a),

Income Tax Regs., the applicable caselaw, or, indeed, as a matter of plain common sense, requiring a common shareholder to fund the S corporation's losses with funds from his mattress or with funds borrowed by him from a bank or other unrelated party, rather than with funds obtained from another controlled entity, in order to obtain a basis in the unprofitable S corporation to the extent of the funding.

Recognizing, as he must, that Culnen v. Commissioner, supra supports petitioners' position in principle, respondent attempts to distinguish that case on the ground that, in Culnen, the funds lent to the unprofitable S corporation were derived from the after-tax profits of a related corporation, whereas the funds supplied by Paulan were, in a preliminary step, borrowed from unrelated banks or, in one instance, from Bavaria, Inc., a corporation wholly owned by Robert and Lovella.  A profitable entity's use of undistributed after-tax profits that, in essence, belong to its controlling shareholders or partners, for advances to an S corporation in which those same shareholders or partners are investors, is consistent with the argument that the profitable entity is acting on their behalf.  It is not, however, indispensable to that argument.  Even though Paulan borrowed money to fund Sidal's losses, Paulan might still have been acting on petitioners' behalf in advancing the borrowed funds to Sidal. In that connection, we note that, although Paulan did not possess

the cash or cash equivalent resources necessary to fund Sidal's losses, it did own valuable real property that could be (and was) used on petitioners' behalf as collateral for the bank loans. Where the controlled entity owns assets that, in essence, belong to the controlling shareholders or partners and can be used to obtain loans on behalf of the controlling shareholders or partners, we see no need to distinguish Culnen on the basis of the liquidity of the controlled entity's assets.

2. Sufficiency of Petitioners' Evidence

a. The Paulan Direct Payments

(1) Introduction

We have placed a high bar before any taxpayer who would disavow the form of a direct loan between two entities he controls and, instead, treat the loan as back-to-back loans through him. See, e.g., Shebester v. Commissioner, T.C. Memo. 1987-246 (the taxpayer "may not so easily disavow the form of * * * [his] transaction"); Burnstein v. Commissioner, T.C. Memo. 1984-74 ("'A transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred.'" (quoting Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579 (1977))). In both Shebester and Burnstein, the taxpayer's attempt to recast a direct loan between commonly controlled entities as back-to-back loans through the taxpayer-owner was unsuccessful. In Yates v. Commissioner, T.C. Memo.

2001-280, and <u>Culnen v. Commissioner</u>, T.C. Memo. 2000-139, that attempt was successful. Petitioners argue that their circumstances are controlled by <u>Yates</u> and <u>Culnen</u>.

Petitioners' argument that the Paulan direct payments constituted bona fide back-to-back loans through them individually is essentially premised on two grounds: (1) Like the taxpayers in <u>Yates</u> and <u>Culnen</u> they have historically used Paulan as an "incorporated pocketbook", to discharge their personal obligations, and the advances to Sidal are merely another example of that practice; and (2) after respondent's denial of shareholder basis for Paulan's pre-1997 advances to Sidal, petitioners, at Michel's direction, structured all subsequent Paulan advances to Sidal in a manner intended to constitute bona fide back-to-back loans, an intent that was clearly manifested by the promissory notes, the minutes, and the accounting for those advances by Paulan and Sidal. We shall consider those grounds in turn.

(2) <u>Status of Paulan as an "Incorporated Pocketbook"</u>

In <u>Yates v. Commissioner</u>, <u>supra</u>, over a 4-year period, the taxpayers wrote 409 checks on the payor corporation's account totaling $1,831,156 for various personal expenses and, at the taxpayer husband's direction, the payor corporation's personnel wrote 113 checks totaling $2,231,248 "to or for the * * *

[taxpayers]." We concluded that the taxpayers "used * * * [the payor corporation] as an incorporated pocketbook."

In Culnen v. Commissioner, supra, we found that "for many years (including the years in question), the * * * [taxpayer] had used * * * [the payor corporation] as an incorporated pocketbook, having the corporation make payments on his behalf, which payments were posted to * * * [the payor corporation's] books as loans to * * * [the taxpayer]."

In both Yates and Culnen, we understood the term "incorporated pocketbook" to describe the taxpayer's habitual practice of having his wholly owned corporation pay money to third parties on his behalf. Whether that practice is habitual and whether it is probative of whether any ambiguous payment is being made by the corporation on behalf of its owner (as opposed to on its own behalf) are questions of fact to be resolved on the basis of the particular facts of the case. The term "incorporated pocketbook" describes a set of facts, not a legal conclusion. It is not a term of art.

The evidence indicates that, over a 5-year period (1996- 2000), Paulan wrote 55 checks (the 55 checks) to or on behalf of petitioners totaling $689,784 (summarized in a schedule entitled "Paulan Properties Summary of Partners Draw Checks").[15] Of those

---

[15] The schedule lists 20 additional checks totaling $169,364, but it is not clear that any of those checks were

(continued...)

checks, 21 (totaling $195,286) were written to various taxing authorities in payment of petitioners' personal tax liabilities (11 for Al, 10 for Sid), and three (totaling $6,593) went to pay insurance premiums for Sid. The other 31 checks (totaling $487,905) (the 31 checks) were written to petitioners (16 to Al, 15 to Sid, all listed under the heading "General"), presumably, to use in any way they saw fit. There is no evidence that the 55 checks were treated on Paulan's books as anything other than distributions to petitioners.

We do not consider the 31 checks as anything other than distributions of accumulated profits or, if more than accumulated profits, as return of capital. Being written to petitioners, those checks are not evidence of their use of Paulan as an incorporated pocketbook; i.e., to make payments directly to third parties on behalf of one or the other of petitioners. Moreover, the 24 Paulan checks paid over a 5-year period for petitioners' taxes and insurance (approximately five checks a year) are not of a volume or of such a general nature that we are convinced that Paulan habitually paid petitioners' bills. In sum, the 55 checks and the conclusions to be drawn from them are insufficient to convince us that the Paulan direct payments were made by Paulan to Sidal on petitioners' behalf.

---

[15](...continued)
written for or on behalf of either Sid or Al, personally.

(3)  Analysis of Petitioners' Evidence of Loans by
     Them to Sidal

(a)  Introduction

Both Michel and petitioners gave uncontradicted testimony that they believed the wire transfer and Paulan direct payments were structured so as to constitute back-to-back loans from Paulan to petitioners and from petitioners to Sidal, thereby generating bases for petitioners in Sidal equal to the loan amounts.  As we have already noted, however, supra section III.C.2. of this report, petitioners' beliefs are not necessarily determinative, and we must be objective in judging intent. Before we address the particular facts in front of us, we make some preliminary observations.

Yates v. Commissioner, supra, and Culnen v. Commissioner, supra, instruct us that we are not required to find that Sidal's indebtedness ran to Paulan, rather than to petitioners, solely because the flow of the borrowed funds ran directly from Paulan to Sidal, and the flow of the principal and interest payments ran directly from Sidal to Paulan.  See also Gilday v. Commissioner, T.C. Memo. 1982-242 n.8, in which we were untroubled by such direct payments and characterized a scenario in which the S corporation repays the shareholder who in turn repays the lender as "the utilization of fruitless steps."

Nor do we consider it fatal to petitioners' position that the back-to-back loan structure was adopted in order to enable

petitioners to acquire tax bases in Sidal; i.e., for tax minimization or avoidance purposes. This case does not involve a brief, circular flow of funds beginning and ending with the original lender, the sole purpose of which is to generate a tax basis in an S corporation. See Kaplan v. Commissioner, T.C. Memo. 2005-218, and Oren v. Commissioner, T.C. Memo. 2002-172, affd. 357 F.3d 854 (8th Cir. 2004), in both of which we found that such an arrangement had no economic substance and, therefore, did not involve the actual economic outlay required to create a basis in the S corporation. The loans to Sidal had a valid business purpose; i.e., to provide working capital for the operation and expansion of Sidal's business. Although the back-to-back loan structure was adopted in order to achieve tax bases for petitioners in Sidal equal in amount to the loans, that is a permissible motivation for that structure. See Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934) ("Anyone may so arrange his affairs that his taxes shall be as low as possible"), affd. 293 U.S. 465 (1935). See also Gilday v. Commissioner, supra, in which we sustained the taxpayer-shareholder's loan basis in an S corporation despite the parties' agreement that the transaction which gave rise to that basis "was motivated by tax considerations."

It is necessary, however, that petitioners' intent to establish a back-to-back loan structure in connection with the

Paulan direct payments be clearly manifested by the actions of the parties to those transactions; viz, petitioners, Paulan, and Sidal.  With that thought in mind, we examine the parties' actions as evidenced by the promissory notes, the minutes, and the accounting entries.

(b)   The Promissory Notes

Petitioners point to the promissory notes as documentary evidence of the back-to-back loan structure and, in particular, of "real, enforceable loan obligations between * * * [them] and Sidal."  Respondent argues that because the promissory notes reflected loans that were unsecured, yet provided for the same interest rates as the secured bank loans to Paulan (i.e., because the terms of those loans were not arm's-length), and because the execution dates of the notes are uncertain, they cannot be considered "genuine".

We do not find the alleged failure of the promissory notes to satisfy an arm's-length standard to be of much help in deciding the issue of whether those notes do, in fact, reflect bona fide indebtedness from Sidal to petitioners and from petitioners to Paulan, which is the issue in this case.  If, as respondent argues, the interest rates on the unsecured indebtedness from Sidal to petitioners and from petitioners to Paulan, as set forth in the promissory notes, are too low, those rates may be subject to increase pursuant to section 482.  See

sec. 1.482-2(a)(1), Income Tax Regs.  Nonetheless, we agree with respondent that the promissory notes are entitled to little or no weight in our consideration of whether the back-to-back loans claimed by petitioners actually existed.

Neither petitioner could recall the actual dates upon which the promissory notes were executed.  They could only agree that the notes were executed sometime between 1997 and 2000.  We infer from that testimony that the notes were not executed contemporaneously with the wire transfer and the Paulan direct payments but were, instead, backdated to appear contemporaneous with those payments.  Moreover, none of the eight sets of promissory notes bears an effective date that corresponds to the Paulan direct payment to which it relates.

Five sets of notes bear effective dates that are between 3 days and more than 9 months subsequent to the corresponding Paulan direct payments.  Even if we were to accept as accurate the stated effective dates of those notes, the notes are more reflective of attempts to recharacterize prior debts from Sidal to Paulan as back-to-back loans through petitioners than they are of back-to-back loans as of the dates of the actual Paulan direct payments.  Therefore, at best, those notes suggest the creation of a back-to-back loan structure after the Paulan direct payments to which they relate.  Such a finding would not justify treatment of those notes as anything more than guaranties of Sidal's

existing indebtedness to Paulan, which would be ineffective to create bases in Sidal under section 1366(d)(1)(B).  See <u>Bergman v. United States</u>, 174 F.3d 928 (8th Cir. 1999); <u>Underwood v. Commissioner</u>, 535 F.2d 309 (5th Cir. 1976).

Conversely, the other three sets of promissory notes predate the Paulan direct payments to which they relate.  Those promissory notes also fail to support a finding that the corresponding Paulan direct payments, in substance, created bona fide indebtedness from Sidal to petitioners and from petitioners to Paulan in the amounts set forth and on the dates thereof.  See <u>Perry v. Commissioner</u>, 392 F.2d 458 (8th Cir. 1968) (predated notes insufficient to prove indebtedness from an S corporation to the taxpayer shareholder), affg. 47 T.C. 159 (1966); <u>Thomas v. Commissioner</u>, T.C. Memo. 2002-108 (promissory note bearing a date prior to the transaction to which it relates given no weight), affd. 67 Fed. Appx. 582 (11th Cir. 2003).

(4)  <u>The Minutes</u>

The Paulan minutes, in essence, reflect meetings at which petitioners, acting on behalf of Paulan, authorized loans to themselves individually, and the Sidal minutes, in essence, reflect meetings at which petitioners, acting on behalf of Sidal, authorized borrowings from themselves individually.  As mere authorizations, those meetings are not evidence that the loans,

in fact, occurred, but they can be evidence of an intent to make
the loans.

The purported meeting dates all precede the stipulated
date(s) when the minutes were drafted. Although it is
necessarily the case that meeting minutes cannot be drafted until
after the meeting, we give little or no evidentiary weight to
minutes that follow the alleged meetings to which they relate by
periods of anywhere from a month to more than 3 years. Those
delays, in this case, indicate an attempt to provide an after-
the-fact paper trail of back-to-back loans through petitioners
rather than corroboration of an actual intent to make such loans,
which existed at the time of the Paulan direct payments. Even
the Sidal minutes drafted with respect to the October 31, 2000,
Paulan direct payments are stipulated to have been "drafted and
executed sometime after * * * [that date]." There is no evidence
as to how long after October 31, 2000, the minutes were drafted.
Therefore, we have no reason to give more evidentiary weight to
those minutes than to the minutes relating to the earlier
payments.

We also note that, because the minutes of each of Sidal's
board of directors meetings specify as the meeting date the
alleged effective date of the corresponding set of promissory
notes, five of the eight Sidal board meetings are necessarily
alleged to have been held after the borrowings authorized during

those alleged meetings. (As noted supra, five of the eight sets of promissory notes bear effective dates subsequent to the Paulan direct payment(s) to which they relate.) Because after-the-fact authorizations (as opposed to genuine ratifications) are not credible, that aspect of a majority of the minutes further supports our conclusion that the minutes merit little or no evidentiary weight. In fact, it supports the conclusion that none of the alleged Paulan or Sidal partner/board meetings actually took place in the manner or at the times stated in the minutes.[16]

### (5) The Accounting Entries

Neither the promissory notes nor the minutes furnish significant evidentiary support for petitioners' claim that the Paulan direct payments constituted back-to-back loans, which would give them tax bases in Sidal. Therefore, their claim that the Paulan direct payments constituted back-to-back loans (through them, to Sidal), rests solely upon the accounting for those payments.

---

[16] Because all of the alleged meetings of the Paulan and Sidal partners/directors (i.e., petitioners) are alleged to have occurred on the alleged effective dates of the promissory notes to which they relate, we infer that those meeting dates were selected to be consistent with the promissory note effective dates and not because they represent dates when petitioners, in their capacities as partners/directors of Paulan and Sidal, actually held meetings.

Freyberger, the BR Associates, Inc. controller, testified that one of his functions, particularly on behalf of Sidal, was to track the cashflow in and out. He stated that the "tax characterization" of any cash transfer, on the books of both Paulan and Sidal, was made by Michel. In that connection, he testified that he prepared the annual trial balances, which he gave to Michel, who was responsible for making any adjustments.

Michel testified that he followed that procedure (yearend adjusting entries) with respect to the Paulan direct payments by recharacterizing, as back-to-back loans through petitioners, the notes payable and notes receivable that had been initially recorded by Freyberger (consistent with the actual cashflow) as debt obligations running from Sidal directly to Paulan.

Contrary to Michel's testimony, not all of the Paulan direct payments, which were originally recorded by Freyberger as giving rise to notes payable from Sidal to Paulan, were the subject of yearend adjusting entries on the Sidal and Paulan adjusted trial balances. The July 11, 1997, Paulan direct payment of $1.2 million and the 1998 Paulan direct payments to the extent of $928,000 are reflected on all of the Paulan and Sidal trial balances in evidence (subsequent to those payments) as Sidal notes payable ("N/P") to Paulan or Paulan notes receivable ("N/R") from Sidal. The 1999 and 2000 Paulan direct payments, like their 1997 and 1998 counterparts, were also initially

recorded on Sidal's adjusted trial balances as notes payable ("N/P") to Paulan; but those payments were reclassified at yearend on those trial balances as notes payable ("N/P") to petitioners (one-half of each payment constituting a note payable to each petitioner). We assume corresponding entries and yearend adjusting entries were made on Paulan's 1999 and 2000 adjusted trial balances (which are not in evidence) to convert receivables from Sidal into receivables from petitioners.

Because the 1997 and 1998 Paulan direct payments were always reflected on Sidal's and Paulan's books as giving rise to notes payable from Sidal to Paulan, those accounting entries furnish no support for treating those payments as, in substance, back-to-back loans from Paulan to petitioners and from petitioners to Sidal. The issue with respect to the 1999 and 2000 Paulan direct payments is whether the yearend adjusting entries alone justify such back-to-back loan treatment for those payments. We find that they do not.

In both Yates v. Commissioner, T.C. Memo. 2001-280, and Culnen v. Commissioner, T.C. Memo. 2000-139, we reviewed accounting systems that entailed temporary postings or entries by a bookkeeper reflecting direct loans from the taxpayer's controlled entity to an S corporation in which the taxpayer was a shareholder (which entries were consistent with the actual cashflow), followed (before yearend) by adjusting entries

reclassifying the loans as back-to-back loans through the taxpayer. In both cases, we found that the system was indicative of the contemporaneous treatment of the transactions as back-to-back loans through the taxpayer. In those cases, however, the adjusting entries were consistent with an established course of conduct whereby the payor corporation routinely made payments on behalf of the taxpayer shareholder. As noted supra, petitioners have established no such course of conduct for Paulan.

Moreover, in each of Yates, and Culnen, the taxpayer-shareholder was intimately involved in recording the intercompany advances to the S corporation as giving rise to payables from the S corporation to him. In Yates, it was the taxpayer who directed his accountant to make intercorporate funds transfers and, by yearend, to record those transfers either as distributions to him followed by capital contributions to the payee S corporation or as back-to-back loans to the S corporation through him. In Culnen, the taxpayer's regular accountant testified that it was the taxpayer who routinely, over a 20-year period, directed the bookkeeper for the payor corporation to have that corporation write checks on his behalf and charge the amounts to his loan account with the corporation; and the taxpayer's outside accountant testified that she made the adjusting entries classifying the payor corporation's payments to the loss S corporation as back-to-back loans through the taxpayer on the

basis of conversations with the taxpayer.  In this case, there is no evidence that petitioners were even aware of the Paulen and Sidal accounting entries designed to show back-to-back loans through them or of the fact that the appropriate adjusting entries were not made in connection with the July 11, 1997 and 1998, Paulan payments to Sidal.  Rather, the testimony at trial indicated that petitioners relied completely upon Michel for all tax planning, and that it was Michel who, alone, was responsible for making the accounting entries consistent with his plan to generate tax bases for petitioners in Sidal.  Petitioners, who lacked any hands-on involvement with the accounting for the Paulan direct payments, cannot, like the taxpayers in Yates, and Culnen, rely on those accounting entries to prove the existence of binding debt obligations from Sidal to them and from them to Paulan arising out of those payments on the dates thereof.

In Burnstein v. Commissioner, T.C. Memo. 1984-74, we rejected the taxpayer's attempt to reclassify intercorporate loans as back-to-back loans through the taxpayers, commenting as follows.

> All [the taxpayers] really did was make journal adjustments at the end of each year (when it could be determined that * * * [the transferee S corporation] would have a net operating loss) to reclassify the transferred funds on the books of * * * [the transferor corporation] as accounts receivable due from [the taxpayers] and on the books of * * * [the transferee S corporation] as accounts payable due [the taxpayers]. * * *

        * * * such reclassification is insufficient to
    create "indebtedness of the corporation to the
    shareholder" withing the meaning of * * * [the
    predecessor of section 1366(d)(1)(B)].  * * *

Similarly, we do not believe that the yearend adjusting entries

overseen by Michel with respect to some, but not all, of the

Paulan direct payments were sufficient to justify treating those

payments as giving rise to indebtedness from Sidal to petitioners

on the dates the payments were made.  At best, they caused a

yearend reclassification of Sidal's original debt to Paulan,

which was insufficient to provide petitioners with debt bases in

Sidal under section 1366(d)(1)(B).  See Underwood v.

Commissioner, 535 F.2d 309 (5th Cir. 1976); Bhatia v.

Commissioner, T.C. Memo. 1996-429; Shebester v. Commissioner,

T.C. Memo. 1987-246; Burnstein v. Commissioner, supra.

        (6)  Conclusion

    For the reasons stated, we find that, despite petitioners'

overall intent to take the steps necessary to establish tax bases

in Sidal beginning in 1997, the steps taken (the promissory

notes, the minutes, and the accounting entries) were ineffective

to carry out that intent.  At best, those steps amounted to a

reclassification of initial indebtedness from Sidal to Paulan.

Put quite simply, petitioners, in conjunction with Michel, paid

insufficient attention to detail.  Another example of that

failing is exemplified by the failure to have Sidal issue

information returns (IRS Forms 1099) to petitioners in connection

– 43 –

with its interest payments (actually made to Paulan) on the alleged indebtedness.

We find that petitioners have failed to provide credible evidence that the Paulan direct payments entitled them to any bases in Sidal under section 1366(d)(1)(B).

3. The Wire Transfer Payments

Unlike the Paulan direct payments, the wire transfer payments, in form, suggest a back-to-back loan structure through petitioners as the intermediate borrowers (from Paulan) and lenders (to Sidal). Moreover, the adjusted trial balance for 1997 (and for all subsequent years) always reflected the payments as giving rise to payables from Sidal to petitioners and from petitioners to Paulan. Therefore, there was no necessity for a 1997 yearend adjusting entry. Nonetheless, consistent with the Paulan direct payments, Sidal made all principal and interest payments directly to Paulan.

As in the case of the Paulan direct payments, and largely for the same reasons, we give no significant evidentiary weight to the promissory notes and minutes relating to the wire transfer payments. Petitioners cannot recall when the promissory notes, dated December 18, 1997, were executed (except insofar as they could agree upon an execution date sometime between 1997 and 2000), and petitioners have stipulated that the applicable minutes authorizing those November 24, 1997, payments were

drafted no earlier that June 30, 2000.  Moreover, both the Paulan and the Sidal minutes specify a meeting date (December 18, 1997) on which the alleged loans (from Paulan to petitioners and from petitioners to Sidal) were authorized that is more than 3 weeks after the wire transfer payments actually occurred.

Thus, it is the form of the wire transfer payments and the manner in which they were consistently recorded on both Paulan's and Sidal's books that furnish the evidentiary support for petitioners' position that those payments constituted back-to-back loans giving petitioners bases in Sidal to the extent thereof.  We find that that evidence is sufficient to sustain petitioners' position.  Although we would normally be inclined to view petitioners' participation in the transactions, if they were essentially conduits for transfers of funds from Paulan to Sidal, as without independent legal significance, in this instance petitioners' involvement, at some personal inconvenience,[17] represented a concrete manifestation of an intent to create debt from Sidal to them and from them to Paulan.[18]  The

---

[17]  Petitioners decided to abandon the wire transfer structure for subsequent payments from Paulan to Sidal as an inconvenient (to them) interruption of the interentity flow of funds.

[18]  As discussed supra, were we to view the same-day wire transfers from Paulan to petitioners and from petitioners to Sidal as without independent legal significance, we would disregard those intermediate payments under the so-called step transaction doctrine.

contemporaneous (and subsequent) bookkeeping for the wire transfer payments represented a further manifestation of that intent.[19]

As noted supra (note 7), the amounts of basis attributable to the wire transfer payments that carried over to 1999 are not certain.  It is certain, however, that those basis amounts are substantially less than Sidal's 1999 ordinary loss, thereby enabling each petitioner to deduct only a small portion of that loss and none of Sidal's 2000 ordinary loss.  We assume that the parties will be able to arrive at agreed carryover basis figures in the Rule 155 computation.

E.  Conclusion

The Paulan direct payments did not provide petitioners with any bases in Sidal under section 1366(d)(1)(B).  The wire transfer payments did provide petitioners with carryover bases in Sidal under that section sufficient to enable them to deduct a small portion of Sidal's 1999 ordinary loss and none of Sidal's 2000 ordinary loss.

Decisions will be entered

under Rule 155.

---

[19]  As in Gilday v. Commissioner, T.C. Memo. 1982-242 n.8, we regard the payments of principal and interest by Sidal directly to Paulan rather than to petitioners who, in turn, would have had to transmit those payments to Paulan, as the permissible avoidance of "fruitless steps".