T.C. Memo. 2017-61

UNITED STATES TAX COURT

RUPERT E. PHILLIPS AND SANDRA K. PHILLIPS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29495-14.                    Filed April 10, 2017.

<u>Anthony J. Carriuolo</u>, for petitioners.

<u>W. Robert Abramitis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  The foreclosure tsunami that swept through the country's
real estate markets a decade ago has long since subsided.  But those sent reeling by
it continue to pick up the pieces of their financial and fiscal affairs.  Among them
are Sandra and Rupert Phillips, a married couple who earned their livelihood from
developing and selling real estate in one of the worst-hit areas--the "Wiregrass"

[*2] region spanning the Florida Panhandle and nearby Alabama. Mrs. Phillips owned 50% of an S corporation that did the development, and she and her husband (along with others) personally guaranteed bank loans financing this activity. When these development projects collapsed, the lending banks sued them on their guaranties and recovered judgments, which petitioners were unable or unwilling to pay.

Petitioners nevertheless claimed by reason of these judgments an increased basis in Mrs. Phillips' investment in the S corporation, which they hoped would allow them to claim additional flowthrough loss deductions and net operating loss (NOL) carrybacks for various years. The Internal Revenue Service (IRS or respondent) disappointed these hopes and determined deficiencies and accuracy-related penalties under section 6662(a)[1] as follows:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2004 | $751,242 | $150,248 |
| 2005 | 871,889 | 174,378 |
| 2008 | 113,138 | 22,628 |
| 2009 | 800 | 160 |
| 2010 | 151,578 | 30,316 |

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code) as in effect for the tax years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

**[\*3]** After concessions,[2] the main issue for decision is whether petitioners are entitled to basis credit for unpaid judgments entered against Mrs. Phillips on account of personal guaranties she had furnished on loans on which the S corporation or its wholly owned subsidiaries defaulted. We agree with respondent that the answer to this question is "no" and thus rule for the IRS as to the deficiencies. But we find that petitioners are not liable for any penalties.

FINDINGS OF FACT

The parties submitted before trial a stipulation of facts including exhibits that is incorporated by this reference. Petitioners resided in Florida when they timely petitioned this Court.

I.      The Real Estate Business

Olson & Associates of NW Florida, Inc. (Olson), was a Florida corporation organized in 2001 and dissolved in 2011. For Federal income tax purposes it was a subchapter S corporation for the duration of its existence. At all relevant times

---

[2]Petitioners have conceded that they received unreported taxable interest income of $1,178 for 2008. They have also conceded that they received unreported gambling winnings of $192,878, $9,727, and $3,155 for 2008, 2009, and 2010, respectively. The IRS has acknowledged that the resulting increases in petitioners' gambling income would make available equal or larger gambling losses for each of those three years. All other adjustments (apart from those discussed in the text) are computational and their effect will be determined in a Rule 155 computation.

[*4] Carl R. Olson, Jr., owned 50% of the company's common stock and Sandra Phillips owned the other 50%. Rupert Phillips was employed by the company.

Olson was engaged in developing and selling residential and commercial real estate in northwest Florida and southern Alabama. It undertook about 20 discrete development projects during the decade it was in existence. Like many real estate development businesses, it relied heavily on debt financing; its projects were encumbered at various times with aggregate debt of almost $191 million. The bulk of this debt was incurred by lower tier subsidiaries and was secured by mortgages encumbering the real estate properties. At trial petitioners conceded that, at the time these loans were obtained, they were "clearly supported by * * * collateral that was pledged." A relatively small portion of the debt was incurred at the S corporation level and was unsecured.

For each development project Olson would typically set up a wholly owned special purpose entity (SPE) that was a limited liability company or other pass-through entity. The SPE would acquire raw land and develop subdivisions or other buildings on that land. To finance each project, the SPE would obtain loans from banks or other third parties. These loans were secured by all of the SPE's assets, including the land under development.

**[*5]**   Virtually all of the loans that the banks extended to Olson and its subsidiaries were guaranteed by Olson's two shareholders (including Mrs. Phillips) and/or their spouses.  Some of the loans had up to five distinct coguarantors (including Olson itself).  There is no evidence that petitioners pledged any personal assets or otherwise provided the banks with any collateral in support of their guaranties.  The only collateral to which the banks could look for repayment of their loans was the real estate and other assets held by Olson and its subsidiaries.

The nationwide downturn in the real estate market that began in late 2006 was especially severe in Olson's region of operations.  Starting in 2007 the company's business experienced a spiraling decline in sales, revenue, and cashflow from which it never recovered.  This precipitated a default on virtually every loan owed by the company and its SPEs.  The lenders sued for repayment, typically foreclosing on the property that secured the indebtedness.

Because the real estate had declined so precipitously in value, the collateral was usually insufficient to satisfy these judgments.  The lenders accordingly sued the guarantors, seeking enforcement of the personal guaranties to satisfy the deficiencies.  Ten of these actions resulted during 2008-09 in final judgments, issued by Florida State courts, aggregating about $105 million against Mrs. Phillips and the coguarantors, including her husband.

**[*6]**  The coguarantors bore joint and several liability for each of these judgments.  As of the time the record in this case closed, neither petitioner had paid any amount toward these judgments.  Nor had either petitioner made any direct payments to Olson's lenders under his or her guaranties.

Nonetheless, after receiving professional advice in 2010, including a formal opinion from tax counsel, petitioners took the position that Mrs. Phillips was entitled to increase her basis in her Olson stock as a result of these judgments.  Petitioners assigned $7,069,639 of the unpaid judgments to 2008 and the remaining $97,703,385 to 2009.  For each year, petitioners then allocated to each coguarantor a pro rata share of the unpaid judgment amounts exceeding all available collateral.  After allocating to Mrs. Phillips her "proportionate share of the judgments less the fair market value (FMV) of the underlying property securing the liabilities," petitioners claimed that she had made deemed capital contributions to Olson, and thereby secured additional basis in her stock, of $1,553,360 in 2008 and $30,187,249 in 2009.[3]

---

[3]The legal opinion on which petitioners relied did not take a definitive position as to whether Mrs. Phillips' increased investment in Olson should be characterized as equity (a supposed contribution to capital) or debt (a supposed back-to-back loan).  But it suggested that a stepped-up stock basis "may be more probable" than an increase in her basis in Olson's indebtedness, and petitioners on their tax returns opted for the former.

**[\*7]** II.      <u>Petitioners' Tax Returns and IRS Audit</u>

Petitioners timely filed their 2008 joint Federal income tax return, which reported a loss of $2,434,648 on Schedule E, Supplemental Income and Loss. They requested a refund for 2008 of $26,989, which they apparently received. After securing the tax advice mentioned above, petitioners in October 2010 filed an amended 2008 return and concurrently filed a timely 2009 return. With each of these returns petitioners included a disclosure statement noting that they were claiming a basis increase in Mrs. Phillips' stock in Olson, of $1,553,360 and $30,187,249, respectively, and briefly explaining how they determined these amounts.

The tax ramifications flowing from these claimed basis increases are complex but may be summarized as follows. On their 2008 amended return petitioners claimed a Schedule E loss deduction of $3,890,069, which was $1,455,421 larger than that claimed on their original 2008 return. For 2009 petitioners claimed a Schedule E loss deduction of $10,518,948 and an NOL of $10,349,265. Under former section 172(b)(1)(H), petitioners elected a five-year carryback period for this NOL, applying $4,625,394 against their 2004 tax liability and the remaining $5,723,871 against their 2005 tax liability. Petitioners filed for each of those two

[*8] carryback years a Form 1045, Application for Tentative Refund, and received from the IRS the refund they requested.

Petitioners timely filed their 2010 return, on which they claimed a Schedule E deduction of $937,000 for the flowthrough loss from Olson, presumably relying on the unused portion of Mrs. Phillips' purported stock basis increase from 2009. That helped generate an NOL for 2010 of $525,710; the record does not establish whether or to which year(s) petitioners carried this NOL.

The IRS examined petitioners' returns for the years at issue and determined that Mrs. Phillips was not entitled to any basis increase on account of her loan guaranties or the unpaid judgments against her. The IRS accordingly adjusted downward petitioners' 2008 flowthrough loss deduction, allowing a Schedule E loss deduction of $2,378,899 (as compared with the $3,890,069 loss deduction claimed on petitioners' amended return). The IRS likewise adjusted downward petitioners' 2009 flowthrough loss deduction, reducing the Schedule E loss deduction from the claimed $10,518,948 to $2,006,205. That left a 2009 NOL of only $1,672,363; this revised NOL was exhausted after application against petitioners' 2004 tax liability, leaving no remaining NOL for application against their 2005 tax liability. Finally, the IRS adjusted downward petitioners' 2010 claimed Schedule E flowthrough loss deduction by $937,000, eliminating the

**[\*9]** claimed NOL for that year.  The IRS sent petitioners a timely notice of deficiency reflecting these adjustments, and they timely petitioned this Court.

OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct though the taxpayer can rebut this presumption.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  The taxpayer bears the burden of proving her entitlement to deductions allowed by the Code and of substantiating the amounts of claimed deductions.  <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs.  In certain circumstances the burden of proof on factual issues may shift to the Commissioner.  <u>See</u> sec. 7491(a); Rule 142(a)(1).  Petitioners do not contend that this provision applies here, and they thus bear the burden of proof.

I.      Petitioners' Basis in the S Corporation

    A.      Governing Tax Principles

A subchapter S corporation is a pass-through entity.  Section 1366(a) generally provides that an S corporation's shareholders are taxed currently on the corporation's income regardless of distributions; its items of loss, deduction, and credit are likewise passed through to them.  However, section 1366(d) provides that "[t]he aggregate amount of losses and deductions taken into account by a

**[\*10]** shareholder" cannot exceed the sum of "the adjusted basis of the shareholder's stock" and "the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder." Sec. 1366(d)(1)(A) and (B).

Losses and deductions that cannot be used by a shareholder currently are "treated as incurred by the corporation in the succeeding taxable year with respect to that shareholder." Sec. 1366(d)(2)(A). In effect, such losses are carried forward indefinitely. If the shareholder later increases her stock basis or her basis in the company's debt, suspended losses become available in that year to the extent of the basis increase.[4]

The Code does not specify in detail how a shareholder may acquire basis in an S corporation's debt. The Senate Finance Committee report accompanying the enactment of subchapter S stated that the adjusted basis of any shareholder's "investment in the corporation" should act as a lid on losses flowing through to that shareholder. S. Rept. No. 85-1983, at 5008 (1958), 1958-3 C.B. 922, 1141. General tax principles, developed in other contexts, would apply with equal force for purposes of section 1366(d)(1) and require that the S corporation's indebtedness to

---

[4]Although a shareholder can acquire additional basis in the S corporation either by advancing capital or by making a loan, a loan (unlike a capital contribution) will not increase the proportionate ratio of losses allocated to that shareholder as compared with the other shareholders.

**[\*11]** the shareholder be genuine and reflect economic reality. Cf. Geftman v. Commissioner, 154 F.3d 61, 73 (3d Cir. 1998) (requiring "objective indicia of an obligation" to support the existence of indebtedness between related parties), rev'g in part, vacating in part T.C. Memo. 1996-447.

The courts have consistently held that, in order for a taxpayer to acquire additional basis in an S corporation's indebtedness, there must be "an actual economic outlay by the taxpayer." Hitchins v. Commissioner, 103 T.C. 711, 715 (1994); see, e.g., Maloof v. Commissioner, 456 F.3d 645, 649-650 (6th Cir. 2006), aff'g T.C. Memo. 2005-75; Underwood v. Commissioner, 535 F.2d 309 (5th Cir. 1976), aff'g 63 T.C. 468 (1975); Spencer v. Commissioner, 110 T.C. 62, 78-79 (1998), aff'd without published opinion, 194 F.3d 1324 (11th Cir. 1999); Perry v. Commissioner, 54 T.C. 1293, 1296 (1970), aff'd per order, 1971 WL 2651 (8th Cir. May 12, 1971). Before the taxpayer may increase her basis, "there must have occurred some transaction which when fully consummated left the taxpayer poorer in a material sense." Perry, 54 T.C. at 1296. "Since Perry, 'economic outlay' has been the coin of the realm when it comes to assessing whether a transaction increases a taxpayer's basis." Maloof, 456 F.3d at 649; see Sleiman v. Commissioner, 187 F.3d 1352, 1357 (11th Cir. 1999) (noting "the general rule that an 'economic outlay is required before a stockholder in a Subchapter S corporation may in-

[*12] crease her basis'" (quoting <u>Selfe v. United States</u>, 778 F.2d 769, 772 (11th Cir. 1985))), <u>aff'g</u> T.C. Memo. 1997-530.

Applying the "actual economic outlay" test, the courts have repeatedly held that a shareholder's guaranty of an S corporation's debt--without more--does not give rise to additional basis. <u>See, e.g.,</u> <u>Maloof</u>, 456 F.3d at 650; <u>Estate of Bean v. Commissioner</u>, 268 F.3d 553, 558 (8th Cir. 2001) (ruling that "a mere guaranty of a corporate loan is insufficient" to create basis), <u>aff'g</u> T.C. Memo. 2000-355; <u>Brown v. Commissioner</u>, 706 F.2d 755, 756 (6th Cir. 1983) ("[T]he courts have consistently required some economic outlay by the guarantor in order to convert a mere loan guaranty into an investment."), <u>aff'g</u> T.C. Memo. 1981-608. The courts have applied essentially the same "economic outlay" test regardless of whether the shareholder claims, by reason of a loan guaranty, additional basis in the S corporation's stock or indebtedness. <u>See</u> <u>Maloof</u>, 456 F.3d at 649, 650; <u>Uri v. Commissioner</u>, 949 F.2d 371, 373 (10th Cir. 1991) (ruling that a mere guaranty does not create basis because it was not a "contribution[] of cash or other property"), <u>aff'g</u> T.C. Memo. 1989-58.

As the U.S. Court of Appeals for the Fourth Circuit has explained: "A guarantee, in and of itself, cannot fulfill * * * [the economic outlay] requirement. The guarantee is merely a promise to pay in the future if certain unfortunate events

**[\*13]** should occur." Estate of Leavitt v. Commissioner, 875 F.2d 420, 422 (4th

Cir. 1989), aff'g 90 T.C. 206 (1988). The U.S. Court of Appeals for the Fifth

Circuit has similarly noted:

> [C]ourts have consistently held that when a shareholder personally
> guarantees a debt of his S corporation, he may not increase his
> adjusted basis in the [S] corporation's indebtedness to him unless he
> makes an economic outlay by satisfying at least a portion of the
> guaranteed debt.

Reser v. Commissioner, 112 F.3d 1258, 1264 (5th Cir. 1997) (fn. ref. omitted),

aff'g on this issue T.C. Memo. 1995-572. And as we explained more than 40

years ago:

> [I]t is the payment by the guarantor of the guaranteed obligation that
> gives rise to indebtedness on the part of the debtor to the guarantor.
> The mere fact that the debtor defaults and thereby renders the
> guarantor liable is not sufficient. * * * The adjusted basis for
> indebtedness * * * is limited to "the actual economic outlay of the
> shareholder." * * *

Underwood, 63 T.C. at 476 (quoting Perry, 54 T.C. at 1296). Earlier, we had

stated more succinctly: "No form of indirect borrowing, be it guaranty, surety,

accommodation, comaking or otherwise, gives rise to indebtedness from the cor-

poration to the shareholders until and unless the shareholders pay part or all of the

obligation." Raynor v. Commissioner, 50 T.C. 762, 770-771 (1968).[5]

---

[5]In July 2014 the Department of the Treasury issued regulations governing

(continued...)

**[*14]**  B.    Application to This Case

Although petitioners on their returns claimed an increased basis for Mrs. Phillips in her Olson stock, at trial and on brief they argued alternatively for additional basis in the company's indebtedness to her.  Both arguments ultimately rest on a "substance vs. form" argument, viz., on the theory that the guaranteeing shareholder in substance has borrowed funds directly from the lender, then transferred the loan proceeds to the S corporation either as a contribution to capital or a back-to-back loan.  In either event, the question we must decide is whether Mrs. Phillips made the actual economic outlay requisite to securing a basis increase.

Petitioners do not dispute that the "economic outlay" test governs our inquiry.  And they do not contend that a shareholder guaranty, without more, justifies an increase in basis.  Rather, they urge that the facts of this case supply the "more" that is needed.  Here, the lenders actually sued petitioners on their guar-

---

⁵(...continued)
shareholder basis in S corporation indebtedness.  T.D. 9682, 2014-33 I.R.B. 342; sec. 1.1366-2(a), Income Tax Regs.  These regulations provide that "[a] shareholder does not obtain basis of indebtedness in the S corporation merely by guaranteeing a loan or acting as a surety * * * relating to the loan."  Sec. 1.1366-2(a)(2)(ii), Income Tax Regs.  On the other hand, the shareholder may increase basis if she "makes a payment on bona fide indebtedness of the S corporation for which * * * [she] has acted as a guarantor or in a similar capacity."  Ibid.  These regulations apply to transactions occurring after their issuance, though taxpayers may elect to apply them to any open tax year.  See sec. 1.1366-5(b), Income Tax Regs.  For obvious reasons petitioners did not make this election.

[*15] anties and recovered deficiency judgments against them, resulting in liens against their real and personal property in Florida. Even though petitioners have paid nothing toward these judgments, they insist that the judgments themselves demonstrate an "actual economic outlay" on the part of Mrs. Phillips by showing that the lenders looked to her as a source of repayment.

In advancing this line of argument, petitioners rely chiefly on Selfe, 778 F.2d 769. That opinion was issued by the U.S. Court of Appeals for the Eleventh Circuit, the court to which appeal of the instant case (absent stipulation to the contrary) would lie. Under Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), we are guided by Eleventh Circuit precedent in deciding this case.

In Selfe, the taxpayer started a retail clothing business as a sole proprietorship and secured bank financing. She pledged assets owned by her and her family as collateral for the loans. The business was later incorporated and elected S corporation status, whereupon the corporation (at the bank's request) was substituted as the obligor on the loans. However, the taxpayer's personal assets remained pledged as collateral and, as the company's sole shareholder, she personally guaranteed the loans. Selfe, 778 F.2d at 770-771.

**[*16]** Because the business suffered recurring losses but did not default, the taxpayer was never required to make any payment on her guaranty. She nevertheless claimed that the guaranty gave her additional basis for the purpose of deducting flowthrough losses from the S corporation. The IRS disagreed and, in a subsequent refund suit, the District Court granted summary judgment for the Government. It reasoned that the economic outlay required for a basis increase "occurs only when the shareholder-guarantor is called upon to pay the corporation's debt." Id. at 772.

On appeal the Eleventh Circuit agreed that an "economic outlay is required before a stockholder * * * may increase her basis." Ibid. But it did not believe that this test necessitates that the shareholder "must, in all cases, absolve a corporation's debt before she may recognize an increased basis as a guarantor." Rather, it concluded that a basis increase may be justified "where the facts demonstrate that, in substance, the shareholder has borrowed funds and subsequently advanced them to her corporation." Id. at 772-773. Establishment of this factual predicate would require proof that "the lender looks to the shareholder as the primary obligor." Id. at 774.

The Court of Appeals recognized in Selfe that arguments such as this "usually meet with little success because the taxpayer is unable to demonstrate that

**[*17]** the substance of his transaction is different than its form." Ibid. However, the court noted certain aspects of the record suggesting that the bank may have actually viewed the taxpayer individually, rather than her corporation, as the primary obligor. These included the facts that: (1) the bank originally extended credit to the taxpayer individually, with the corporation substituted later as the obligor; (2) the taxpayer pledged her own assets as collateral for the loan, and her assets remained pledged after the loan was reissued in the company's name; (3) the S corporation was "a fledgling enterprise," was "operated by a novice in a highly competitive field," and was "thinly capitalized," thus making it a poor credit risk; and (4) the taxpayer "presented the deposition testimony of her loan officer stating that the bank primarily looked to the taxpayer and not the corporation for repayment of the loan." Selfe, 778 F.2d at 774.

The Eleventh Circuit concluded on the basis of this evidence that "there * * * [were] material facts still in issue." Id. at 775. It accordingly reversed the grant of summary judgment and remanded to the District Court to determine whether the loan to the corporation "was in reality a loan to the taxpayer." The Court of Appeals indicated that this would require a factual determination as to "whether or not the bank primarily looked to * * * [the taxpayer] for repayment." Ibid.

[*18]  The facts in the instant case differ from those in Selfe on each of the important points identified by the Court of Appeals.  There is no evidence that Olson's lenders had a prior relationship with petitioners or that petitioners previously had been obligors on these loans.  Petitioners did not pledge any of their personal assets as collateral for the loans; all the collateral (consisting primarily of real estate) was supplied by the SPEs or their subsidiaries.  Olson was a well-established company with a good reputation, and petitioners conceded that the loans when made were "clearly supported by the collateral that was pledged."  Most importantly perhaps, petitioners produced no testimony or other evidence from any of the lending banks that any bank "look[ed] to the shareholder as the primary obligor" on any loan.  Id. at 774.  It is hard to see how a taxpayer could establish a bank's intentions or expectations on this point without producing testimony from someone at the bank.

Indeed, the facts of this case resemble those of Sleiman, supra, in which the Eleventh Circuit distinguished Selfe and held that a guaranty without payment did not create basis.[6]  There, as here, the shareholder-guarantors had not previously been obligors on any S corporation loan and they pledged no collateral in support

---

[6]We note that the appellate court's opinion in Sleiman was written by Judge Kravitch, who also authored the opinion in Selfe, writing in each case for a unanimous panel.

**[\*19]** of their guaranties.  Rather, the collateral was supplied by the S corporation, which was successful and well established.  At the time they extended credit, the banks estimated that the collateral (chiefly real estate) "was worth nearly twice the amount of the loans." Id. at 1358.  A bank officer testified that the bank had requested guaranties from the taxpayers, not because it looked to them as the primary source for repayment, but because "the bank's general policy was to require personal guarantees on loans to closely held corporations." Ibid.

The Eleventh Circuit in Sleiman, 187 F.3d at 1359, described Selfe as involving an "unusual set of facts."  It concluded that the taxpayers in Sleiman had not established the unusual factual predicate necessary to show that the loans, in form extended to the S corporation, had in substance been extended to the shareholders individually.  For similar reasons we reach the same conclusion here: There is simply no evidence that Olson's banks looked to petitioners as the primary source for repayment of the loans.  See Selfe, 778 F.2d at 775.

Petitioners urge that the deficiency judgments against Mrs. Phillips gave rise to an "actual economic outlay" by (among other things) impairing her credit.  This argument misapprehends the theory that formed the basis for the Eleventh Circuit's remand in Selfe.  The theory was that the bank, while nominally lending to the S corporation, may in substance have lent to the shareholder, who then con-

**[\*20]** tributed the loan proceeds to the corporation.  In order to identify the "true obligor" in such circumstances, it is necessary to examine the lender's intentions and other economic facts existing when the lender makes the loan.  A court's entry of a deficiency judgment against a guarantor many years later, after the corporation has defaulted and the corporation's collateral has proven insufficient, is simply not relevant in determining whether the lender, when initially extending credit, looked to the shareholder as the primary source of repayment.

That being so, Mrs. Phillips could make the required "economic outlay" in favor of Olson only by making a payment toward the judgments.  This would create a debt from Olson to her and give her additional basis in that amount.  But since she has made no payments either on the guaranties or on the judgments, she is not entitled to the basis increases that petitioners claimed.[7]

---

[7]The other authorities on which petitioners rely are also factually inapposite. In Gilday v. Commissioner, T.C. Memo. 1982-242, the lender evaluated the shareholders' credit before making a loan to their S corporation and they ultimately substituted their own promissory note for that of the corporation.  In Rev. Rul. 75-144, 1975-1 C.B. 277, the execution of the guaranteeing shareholder's own note, and its acceptance by the lending bank, constituted a payment of the S corporation's existing debt to the bank, allowing the shareholder to acquire basis under the doctrine of subrogation.

**[\*21]**  C.    Quantifying the Basis Increase

Even if petitioners had shown that the deficiency judgments theoretically entitled Mrs. Phillips to some basis adjustment, they did not carry their burden of proving the magnitude of the basis increase.  As noted earlier, petitioners allocated to Mrs. Phillips a portion of the unpaid deficiency judgments entered against her and the coguarantors.  They first subtracted from the amounts of the judgments the supposed FMV of the collateral foreclosed upon or otherwise transferred to the judgment creditors.  They then allocated the deficiencies pro rata among all co-guarantors.  Where Olson itself had guaranteed an SPE's debt, petitioners allocated half of its pro rata share to Mrs. Phillips, reflecting her 50% ownership stake in the company.  Each step of this exercise rests on questionable assumptions, and petitioners have not addressed (let alone answered) many of the attendant questions.

Petitioners' estimates of the FMV of the collateral transferred to the judgment creditors are inadequately supported and internally inconsistent.  Moreover, for three of the judgments, an attachment to the 2010 legal opinion on which petitioners relied assumes that "for Federal tax purposes, borrower did not abandon, and would not be deemed to have abandoned, its real property which secures its obligations under the Guaranteed Debt."  The opinion accordingly warns that any

[*22] basis increase ascribed to those judgments "will require downward adjustments * * * to account for and credit the * * * [borrower's] pending or prospective return of the secured real property to the applicable lenders." The record includes no evidence as to whether this collateral was returned or (if so) whether petitioners made the requisite downward adjustments to Mrs. Phillips' claimed increase in basis.

For each loan in question, all coguarantors bore joint and several liability. Petitioners advance no reason for believing that the judgment creditors would pursue all coguarantors pro rata rather than simply targeting the deepest pocket. Petitioners point to Florida courts' embrace of the equitable right of contribution among co-obligors, pursuant to which "[a]n obligor who has paid in excess of his prorata share of the obligation, is entitled at law to contribution from the other obligors for their aliquot share." Campbell v. Gordon, 674 So. 2d 783, 787-788 (Fla. Dist. Ct. App. 1996). But this would simply substitute a new set of claims for the deficiency judgments that Mrs. Phillips has proven unwilling or unable to pay.

We do not see why the possibility of such feckless claims against Mrs. Phillips should dictate that the judgments be allocated pro rata among the guarantors. Indeed, as respondent observes, if Olson's other shareholder paid a deficiency

**[*23]** judgment in its entirety, he would make an "actual economic outlay" entitling him to a corresponding basis increase. Allocating a pro rata portion of that judgment to Mrs. Phillips would then generate a combined basis increase exceeding the amount owed to that judgment creditor in the first place.

It is often said that when life serves you lemons, you make lemonade. Petitioners took that advice to heart, squeezing as much juice as possible from the unpaid judgments against them. But even if petitioners could show theoretical entitlement to some basis increase, they have not borne their burden of proving that the amount of this increase would be equal to or greater than the aggregate flow-through loss deductions they claimed on their 2009, 2010, and amended 2008 tax returns. Because petitioners bear the burden of proof, "to the extent that the record is incomplete, the Court is not warranted in indulging in conjectures in petitioners' favor to fill the gap." Estate of Pierpont v. Commissioner, 35 T.C. 65, 68 (1960), vacated and remanded on other grounds, 301 F.2d 287 (4th Cir. 1962); see also Reinecke v. Spalding, 280 U.S. 227, 233 (1930) (holding that the burden rests on the taxpayer to prove not only his entitlement to a tax benefit but also the amount of that benefit).

Had Mrs. Phillips made an actual payment toward these judgments, of course, the basis increase to which she would be entitled would be obvious. The

[*24] speculative and conjectural nature of the computational exercise in which petitioners must engage absent any payment underscores the wisdom of the rule that no basis increase is allowed without an actual economic outlay.

## II. Penalties

The Code imposes a 20% penalty upon the portion of any underpayment of income tax that is attributable to (among other things) "negligence" or any "substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). "Negligence" is defined as "any failure to make a reasonable attempt to comply" with the provisions of the Code. See sec. 6662(c). An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. See sec. 6662(d)(1)(A).

Invoking both grounds in the alternative, the notice of deficiency asserted an accuracy-related penalty on the full amount of the deficiency for each year. Respondent has since conceded the vast bulk of those penalties, viz., the portions attributable for each year (including the carryback years) to the flowthrough loss deductions discussed above, for which petitioners had secured an opinion from competent tax counsel. In his post-trial brief, however, respondent states that his concession does not cover the penalties asserted in the notice of deficiency "as they relate to the adjustments conceded by petitioners."

[*25] The adjustments petitioners conceded concern items of unreported income--taxable interest and gambling winnings--for 2008, 2009, and 2010. But the gambling winnings appear to be offset in full by petitioners' excess gambling losses, leaving no understatement of income tax attributable to these items. See supra note 2. Thus, the only adjustment petitioners conceded that gives rise to any understatement of income tax is the failure to report $1,178 of interest for 2008.

Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of an individual for any penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent has not carried that burden here. He has not shown that the tax on $1,178 of interest would likely "exceed[] the greater of $5,000 or 10% of the tax required to be shown on the return." See sec. 6662(d)(1)(A). And in the rather terse discussion he accords to penalties in his post-trial brief, respondent has provided no reason to believe that petitioners' failure to report the $1,178 of interest was due to negligence rather than oversight, not having received a Form 1099-INT, or other innocuous cause. Accordingly, we hold that petitioners are not liable for any penalties.

To reflect the foregoing,

Decision will be entered under Rule 155.