B. JAMES PARSON and LORRAINE C. PARSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Parson v. Commissioner
Docket No. 6331-71.
United States Tax Court
T.C. Memo 1974-183; 1974 Tax Ct. Memo LEXIS 136; 33 T.C.M. (CCH) 789; T.C.M. (RIA) 74183; July 10, 1974, Filed. M. Nelson Enmark, for the petitioners. Peter D. Bakutes, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined deficiencies in petitioners' income tax as follows: Year
Deficiency 1963
$ 3,571.53
1964
10,901.00
*137 At issue is the extent of deductibility of a 1966 net operating loss of an electing small business corporation which its sole stockholder carried back to 1963 and 1964. Section 1374(c) (2) of the 1954 Code limits the stockholder's deduction to the sum of the adjusted basis of his stock plus the adjusted basis of any of the corporation's indebtedness to him as of the close of the corporation's taxable year. The principal question presented is whether the sole stockholder assumed certain obligations of his corporation which thereupon became indebted to him prior to the close of its taxable year ended September 30, 1966. A second question is whether a certain payment of $3,500 to him by his corporation reduced its indebtedness to him by that amount. FINDINGS OF FACT The parties have filed two stipulations of facts which, together with accompanying exhibits, are incorporated herein by this reference. Petitioners B. James Parson ("petitioner") and his wife Lorraine C. Parson were residents of Fresno, California, at the time of filing their petition herein. Petitioners filed joint individual *138 income tax returns for the calendar years 1963, 1964, and 1966 with the district director of internal revenue at San Francisco, California. Petitioner was the president and general manager as well as the majority stockholder of A-1 Door and Window Company ("Door"), an electing small business corporation with its principal place of business in Fresno, California. From the time of its incorporation in 1959, Door was engaged in the manufacture, marketing, and sale of cabinets, doors, and window frames. Originally, petitioner had owned all of Door's stock, but over the years he had from time to time transferred blocks of stock to certain persons with the result that as of October 1, 1966, petitioner owned 4,000 shares, or 73 percent, of the issued and outstanding capital stock of Door while five other shareholders each owned 300 shares. Door's taxable year commenced on January 1 and terminated on December 31. In addition to his interest in Door, petitioner was the president and sole owner of A-1 Enterprises ("Enterprises"), an electing small business corporation, as defined in section 1371, I.R.C. 1954, throughout the period here under consideration. Enterprises *139 was engaged in the construction of custom residences, with its principal place of business in Marin County, California, some 200 miles from Fresno. Petitioner delegated the bulk of the supervisory responsibility in the conduct of Enterprises' operations to an employee, Douglas Avery, while petitioner himself devoted the greater portion of his time to Door's business affairs in Fresno. In addition to his other duties, Avery served as Enterprises' bookkeeper; he was not trained as an accountant. Enterprises' taxable year ran from October 1 to September 30. Prior to and during the period October 1, 1965, through September 30, 1966, Door sold construction materials to, among its other customers, Enterprises. Enterprises paid for at least some of these materials by means of construction loans from Santa Rosa Savings and Loan ("SRS&L"). The funds from such loans were disbursed according to a voucher system whereby SRS&L made direct payments to third parties, including Door, which had sold construction materials to Enterprises on account. By reason of its sales to Enterprises, Door had accounts receivable from Enterprises in the following amounts on the dates shown: June 30, 1966
$32,880.99
September 30, 1966
19,931.00
October 31, 1966
22,134.58
December 31, 1966
19,298.78
*140 In addition to the credit on sales which it extended to Enterprises, Door had advanced funds to and for the benefit of Enterprises during a period of more than a year prior to September 3o, 1966.Unlike credit sales, this was not an ordinary practice for unrelated parties in the construction industry, and petitioner had authorized the loans without the express ratification of Door's minority shareholders, although at least one, the senior member of the group, Terrance DeGroot, was aware of this arrangement. On September 30, 1966, Door had loans receivable from Enterprises by reason of such advances in the amount of $16,129. After some earlier success, Enterprises' financial picture grew increasingly bleak during 1966. By June of that year petitioner was of the impression that Enterprises was insolvent, and for that reason he decided that Enterprises would complete its work already in progress and thereafter conduct no new business. Neither this decision nor the general financial outlook of Enterprises, however, appeared in Enterprises' various corporate minutes until the shareholders' meeting of December 20, 1966, at which time the preliminary computations of the year-end bookkeeping *141 had helped to confirm petitioner's fears. Indeed, for the taxable year ended September 30, 1966, Enterprises sustained a net operating loss of $127,759; for the taxable year September 30, 1967, its loss was $5,088. In June, 1966, Terrence DeGroot, Door's bookkeeper and senior minority shareholder, explained to petitioner that he and Door's other minority shareholders were concerned about Enterprises' mounting accounts and its ability to pay them. Petitioner thereupon assured DeGroot to the effect that he would assume responsibility for Enterprises' obligations and would not allow Door to suffer any loss on account of them. Petitioner's assurance was not at that time or later reduced to writing, and petitioner did not meet with any other shareholders in respect of this matter nor did the other shareholders as a group enter into any direct agreement with petitioner. Door's books of account continued to show Enterprises' trade account as it had previous to the DeGroot conversation, that is, as amounts due from Enterprises, not petitioner. Between June 17, 1966, and and December 5, 1966, Door received 28 payments for materials sold to Enterprises, including a single payment of *142 $9,461.42 from Enterprises on July 21 and 13 separate payments from SRS&L during the period June through September. As to the remaining payments the stipulated materials show merely that the source thereof is "unknown". The record contains no evidence that any of the 28 payments were made by petitioner. In its third quarter financial statement dated September 30, 1966, and prepared on October 21, 1966, Door listed accounts receivable from Enterprises in the amount of $36,060 (accounts receivable of $19,931 and notes receivable of $16,129) and notes receivable from petitioner of $9,023. In its year-end report of September 30, 1966, prepared on January 11, 1967, Enterprises reported corresponding amounts payable to Door. [1]
As of December 31, 1966, Door adjusted its records by transferring the outstanding balances due from Enterprises, accounts receivable of $19,298.78 and notes receivable of $16,325.65, to an account for amounts receivable from petitioner personally. This adjustment was also reflected *143 in Door's year-end statement, prepared on January 23, 1967, which showed $47,308 receivable from petitioner and nothing from Enterprises. Both the foregoing adjustment and Door's year-end statement were prepared by James B. McCallum, a certified public accountant, who had also prepared (on January 11, 1967) Enterprises' September 30, 1966 year-end statement. Unrelated to the above described events, petitioner from time to time advanced cash to Enterprises, as a result of which Enterprises' books showed an indebtedness to petitioner on September 30, 1966, of $18,366.44. However, this figure did not reflect Enterprises' payment of $3,500 in June, 1966, to petitioner, which was a repayment pursuant to some offsetting transactions which also did not appear on its books. In addition thereto, the undisputed adjusted basis of another indebtedness of Enterprises to petitioner in the amount of $4,000 was also not included in the $18,366.44 figure. Petitioner's adjusted basis in Enterprises' stock was $5,000. On their income tax return for 1966, petitioners claimed a deduction of $82,750 representing the net operating loss sustained by Enterprises in its taxable year ended September 30, 1966. [2] *144 Petitioners also filed an Application for Tentative Carryback Adjustment by which they sought to carry back portions of the claimed $82,750 loss and thereby offset taxable income reported in 1963 and 1964. As a result of their application, petitioners received income tax refunds as requested in respect of both 1963 and 1964. In his notice of deficiency the Commissioner disallowed the use of a carryback loss from 1966 in excess of $23,866, explaining that the amount of the net operating loss allowable is limited by the adjusted basis of your stock and the adjusted basis of the indebtedness of such corporation to you as of the close of the taxable year of the corporation. The allowable loss was therefore limited to: Adjusted basis of Enterprises stock
$ 5,000
Indebtedness of Enterprises to petitioner
18,866
Total
$23,866
In particular, the Commissioner disputed the existence of any indebtedness arising in 1966 from *145 the assumption by petitioner of Enterprises' debts to Door and asserted that Enterprises' $3,500 payment in June, 1966, reduced its indebtedness to petitioner.
OPINION RAUM, Judge: At issue here is the extent to which petitioner is entitled to deduct a net operating loss suffered by his wholly-owned Subchapter S corporation during its taxable year ended September 30, 1966. Section 1374(a), I.R.C. 1954, provides, as a general rule, that a net operating loss of an electing small businss corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation. This privilege, however, is limited by section 1374(c) (2), the relevant language of which is as follows: (2) Limitation. - A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of - (A) the adjusted basis * * * of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation * * *, and (B) the adjusted basis * * * of any indebtedness of the corporation to the shareholder, determined as of the *146 close of the taxable year of the corporation * * *. The parties are not in dispute as to petitioner's adjusted basis in Enterprises' stock as of the critical date, September 30, 1966, the close of its taxable year. What is contested is the amount of indebtedness of Enterprises to petitioner on that date, and ultimately, his adjusted basis in respect thereof. Petitioner quite properly presents no argument that Enterprises' indebtedness to Door ought to be proportionately attributed to him by reason of his part ownership of Door. Cf. E. J. Frankel, 61 T.C. 343; Ruth M. Prashker, 59 T.C. 172; Robertson v. United States, an unreported case ( D. Nev., 73-2 U.S.T.C. par. 9645). See also Rev. Rul. 69-125, 1969-1 C.B. 207. Rather, petitioner contends that by virtue of his conversation with DeGroot he entered into a binding oral agreement to assume at that time Enterprises' entire liability to Door thereby creating an indebtedness of Enterprises to him in an equal amount. It is the Commissioner's position that the conversation in question did not result in any agreement between petitioner and Door; alternatively, he argues that petitioner *147 assumed only the role of a guarantor of Enterprises' debt to Door, which is insufficient to transform that debt into an indebtedness to petitioner within the meaning of section 1374(c) (2) (B). We hold that the Government must prevail. Even relying entirely upon petitioner's and DeGroot's accounts of their conversation, we are persuaded that petitioner offered DeGroot no more than a forward-looking assurance that he would safeguard Door against any loss on account of Enterprises. With reference to Door's accounts receivable from Enterprises, petitioner testified that he "assured [DeGroot] that those were my debts" and that "[my] assurances were that this corporation really would not suffer because of what the other corporation did". DeGroot recalled "that [petitioner] said that he would take care of it somehow." However, such loose oral assurance to DeGroot leaves substantial doubt whether petitioner entered into a binding agreement with DeGroot, and certainly does not establish that this conversation resulted in a contractural obligation with the corporate entity of Door. Further, even if petitioner had entered into a binding agreement with DeGroot, the record strongly *148 suggests that Enterprises remained primarily liable on its debt to Door (and not to petitioner) throughout the remainder of its taxable year.Door's record of Enterprises' trade account reveals payments received after the time of the conversation in question on behalf of Enterprises from both SRS&L, Enterprises' creditor, and Enterprises itself; in contrast, there is no entry for any payments by petitioner. Also, both Enterprises' and Door's September 30, 1966, statements reflect the accounts in question as still owing from Enterprises to Door. Even allowing for the sometimes unavoidable confusion and delay in readying a small business' year-end financial statement, we are persuaded that Enterprises' September 30 statement, which was not prepared until January 11, 1967, accurately reflected the status of its accounts with Door. We note in this regard that Door's December 31, 1966, statement, the first to show that petitioner had assumed Enterprises' debts to Door, was prepared on January 23, 1967, by the same certified public accountant who had prepared Enterprises' September 30, 1966 statement, only 12 days earlier. Whatever bookkeeping confusion may have preceeded the preparation *149 of these statements, ample time had elapsed to permit the waters to clear. We therefore regard as particularly compelling evidence the fact that although the accountant here involved ultimately took the position that petitioner had "assumed" Enterprises' debt to Door, it was clearly his understanding that petitioner had not substituted himself as Door's debtor and Enterprises' creditor prior to the close of Enterprises' fiscal year ended September 30, 1966. Finally, assuming the existence of a binding agreement entered into by petitioner, his potential liability thereunder was at most in the nature of a guaranty. But such potential liability, whether as a guarantor, surety, or otherwise, did not by itself convert Enterprises' obligations to Door into an "indebtedness" running from Enterprises to petitioner within the meaning of section 1374(c) (2) (B). William H. Perry, 47 T.C. 159, affirmed 392 F.2d 458 (C.A. 8); Ruth M. Prashker, 59 T.C. 172, 176. And until he in fact paid Enterprises' debts, in whatever capacity and regardless of whether his liability be considered as primary or secondary, there is no basis for concluding that Enterprises *150 became obligated to him so as to create an "indebtedness" within the meaning of the statute. [3]Joe E. Borg, 50 T.C. 257, 265; Milton T. Raynor, 50 T.C. 762, 770-771; William H. Perry, supra, 47 T.C. at 164. See also Rev. Rul. 70-50, 1970-1 C.B. 178, as clarified by Rev. Rul. 71-288, 1971-2 C.B. 319. With respect to the payment of $3,500 which he received from Enterprises in June of 1966, petitioner testified that it was part of a wash transaction as far as Enterprises' indebtedness to him was concerned, specifically that it was either the repayment of previous unrecorded advances or a means *151 of using petitioner's checking account as a conduit for paying its bills. In either event, he argues, it did not reduce Enterprises' indebtedness to him for purposes of section 1374(c) (2) (B), and we so hold. Bearing fully in mind that it is petitioner who carries the burden of proof on this issue, we are nonetheless satisfied - although without strong confidence - that petitioner has explained the circumstances of this transaction. It does not strike us as at all unusual that the central figure of a small business such as Enterprises would have occasion periodically to transact its business from his own pocket, nor does it strike us as improbable that the bookkeeping might inadvertently fail to reflect clearly such dealings. On the basis of the foregoing we hold that petitioner did not assume Enterprises' debts to Door prior to the close of its fiscal year ended September 30, 1966, but that the $3,500 payment to petitioner did not reduce Enterprises' indebtedness to him. Decision will be entered under Rule 155. Footnotes
1. Enterprises' balance sheet figures differed only in that the account for notes payable to Door was shown as $16,128, one dollar less than appeared in Door's statement. ↩
2. Although the parties stipulated that Enterprises' net operating loss for 1966 was $127,759, see page [*], supra, both Enterprises' and petitioners' income tax returns for the relevant period reported Enterprises' loss as $82,750. ↩
3. In view of our conclusion that petitioner has failed to show that the alleged indebtedness from Enterprises to him came into being, if at all, prior to the end of its fiscal year (September 30, 1966), we need not pass upon the Government's alternative argument that petitioner in any event has failed to prove that such indebtedness had any basis in his hands, nor need we consider in this connection the California statutes which petitioner presses upon us and the effect of which is vigorously disputed by the Government. ↩