T.C. Memo. 2018-16

UNITED STATES TAX COURT

HOMERO F. MERUELO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1795-13.                     Filed February 5, 2018.

<u>Howard W. Gordon</u>, <u>Leticia Vega</u>, and <u>Alyssa R. Wan</u>, for petitioner.

<u>W. Robert Abramitis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  The Internal Revenue Service (IRS or respondent) deter-mined a deficiency of $2,600,275 in petitioner's Federal income tax for 2005.[1]

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Prac-tice and Procedure.  We round all monetary amounts to the nearest dollar.

[*2] The deficiency stems from the partial disallowance of a flow-through deduction for a net operating loss (NOL), incurred in 2008 by an S corporation in which petitioner held an interest, which he sought to carry back to 2005.[2] The question for decision is whether petitioner had sufficient basis in the S corporation to absorb the entirety of this loss. Finding that he did not, we conclude that the IRS properly disallowed a portion of his claimed deduction for 2005.

FINDINGS OF FACT

The parties filed a stipulation of facts and a supplemental stipulation of facts with attached exhibits, both of which are incorporated by this reference. Petitioner resided in Florida when he petitioned this Court.

Petitioner is a real estate developer in south Florida who holds interests in numerous S corporations, partnerships, and LLCs. One of these entities was Merco of the Palm Beaches, Inc. (Merco). Petitioner incorporated and elected "S" status for Merco in March 2004. During 2008 he held 49% of its stock.

---

[2]Ordinarily a taxpayer can carry an NOL back only to the two taxable years preceding the loss year. See sec. 172(b)(1)(A)(i). However, prompted by the financial crisis and at the direction of Congress, the IRS for taxable years 2008 and 2009 allowed "eligible small businesses" to elect a carryback period of three, four, or five years. See Rev. Proc. 2009-52, 2009-49 I.R.B. 744. Petitioner properly made this election for 2008.

[*3] Petitioner incorporated Merco to purchase a condominium complex in a bankruptcy sale. In early 2004 the bankruptcy court approved the sale and required Merco to pay a $10 million non-refundable deposit to secure the property. To raise funds for his share of the deposit petitioner obtained a personal loan from City National Bank of Florida (CNB).

Petitioner transferred $4,985,035 of the loan proceeds to Merco Group at Akoya (Akoya), an S corporation in which he and his mother each held a 50% interest. On March 3, 2004, Akoya transferred into Merco's escrow account $5 million--petitioner's loan proceeds of $4,985,035 plus $14,965 of Akoya's own funds--to cover half of the required deposit. Akoya had previously transferred to Merco sufficient funds to cover the $5 million balance of the deposit.

During 2004-2008 Merco entered into hundreds of transactions with various partnerships, S corporations, and LLCs in which petitioner held an interest (collectively, Merco affiliates). Merco affiliates regularly paid expenses (such as payroll costs) on each other's or on Merco's behalf to simplify accounting and enhance liquidity. The payor company recorded these payments on behalf of its affiliates as accounts receivable, and the payee company recorded such items as accounts payable.

**[*4]** During 2004-2008 Merco affiliates made payments in excess of $15 million to or on behalf of Merco. Merco repaid its affiliates less than $6 million of these advances. On December 31 of each year, Merco's books and records showed substantial net accounts payable to its affiliates.

Luis Carreras, a certified public accountant, prepared the tax returns filed by petitioner, Merco, and the Merco affiliates. When preparing Merco's tax return for a given year, Mr. Carreras would net Merco's accounts payable to its affiliates, as shown on Merco's books as of the preceding December 31, against Merco's accounts receivable from its affiliates. If Merco had net accounts payable as of that date, Mr. Carreras reported that amount as a "shareholder loan" on Merco's tax return and allocated a percentage of this supposed indebtedness to petitioner, on the basis of petitioner's ownership interests in the various affiliates that had extended credit to Merco.

In an effort to show indebtedness from Merco to petitioner, Mr. Carreras drafted a promissory note dated March 31, 2004, whereby petitioner made available to Merco a $10 million unsecured line of credit at a 6% interest rate. Mr. Carreras testified that, at the time he prepared petitioner's and Merco's tax returns for 2004-2008, he would make an annual charge to Merco's line of credit for an amount equal to petitioner's calculated share of Merco's net accounts payable to

[*5] its affiliates for the preceding year. But there is no documentary evidence that such adjustments to principal were actually made or that Merco accrued interest annually on its books with respect to this alleged indebtedness. There is no evidence that Merco made any payments of principal or interest on its line of credit to petitioner. And there is no evidence that petitioner made any payments on the loans that Merco affiliates extended to Merco when they transferred money to it or paid its expenses.

In 2008 Merco incurred a loss of $26,605,840 when banks foreclosed on the condominium complex it had purchased in 2004. Merco reported this loss on Form 1120S, U.S. Income Tax Return for an S Corporation. Merco allocated 49% of the loss to petitioner on Schedule K-1, Shareholder's Share of Income, Deductions, Credits, etc.

Petitioner filed timely Forms 1040, U.S. Individual Income Tax Return, for 2005 and 2008. On his 2005 return he reported taxable income of $13,895,731 and tax due of $4,843,976. On his 2008 return he claimed, on Form 4797, Sales of Business Property, an ordinary loss deduction of $11,795,109. This deduction reflected a $13,036,861 flow-through loss from Merco ($26,605,840 × 49%) netted against gains of $1,241,752 from two other S corporations in which he held interests.

**[*6]** After accounting for other income and deductions, petitioner reported on his 2008 return an NOL of $11,793,865. In October 2009 he filed Form 1045, Application for Tentative Refund, claiming an NOL carryback of $11,793,865 from 2008 to 2005. After application of this NOL carryback, his original tax liability for 2005, $4,843,976, was reduced by $3,897,470, to $946,506. On January 4, 2010, the IRS issued petitioner a refund of $3,897,470.

The IRS selected petitioner's 2005 and 2008 returns for examination. It determined that his basis in Merco was only $4,985,035, viz., the proceeds of the CNB loan that petitioner contributed to Merco through Akoya. The IRS accordingly disallowed, for lack of a sufficient basis, $8,051,826 of the $13,036,861 flow-through loss claimed for 2008.[3]

After disallowing part of the NOL for 2008, the IRS determined that petitioner's NOL carryback to 2005 was limited to $3,706,272 and that his correct tax due for 2005 was $3,546,781. Because petitioner had reported a tax liability of only $946,506 for 2005 (after application of the NOL carryback), the IRS deter-

---

[3]Petitioner concedes the following adjustments to his 2008 return: (1) additional taxable dividend income of $205 and (2) additional taxable interest income of $35,562. Petitioner also concedes that the statute of limitations does not bar the assessment and collection of a deficiency (if any) for 2005. Respondent agrees that petitioner had sufficient basis in Merco to produce a deductible loss that eliminates any taxable income for 2008.

**[\*7]** mined a deficiency of $2,600,275 for that year. The IRS sent petitioner a timely notice of deficiency setting forth these adjustments, and he timely petitioned the Court for redetermination.

Respondent agrees that petitioner is entitled to basis of $4,985,035 in Merco, corresponding to funds that petitioner personally borrowed from CNB and contributed to Merco through Akoya in March 2004. Petitioner contends that he has substantial additional basis in Merco by virtue of inter-company transfers between Merco and its affiliates. At trial the parties introduced testimony, bank records, other documentary evidence, and spreadsheets in an effort to quantify the payments (and petitioner's allocable share of the payments) that Merco affiliates made to or on behalf of Merco during 2004-2008. We find that petitioner's allocable share of these payments was $13,326,982, calculated as follows:

| Description | Amount | Petitioner's share | Petitioner's amount |
|---|---|---|---|
| Funds separately transferred by Akoya in March 2004 | $5,014,965 | 50% | $2,507,483 |
| Petitioner's share of funds transferred by Merco affiliates wholly or partly owned by petitioner | -- | -- | 10,513,808 |
| Wage expense defrayed by a Merco affiliate as common paymaster | 623,860 | 49% | 305,691 |
| Total | | | 13,326,982 |

**[*8]**                                    OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The taxpayer bears the burden of proving his entitlement to deductions allowed by the Code and of substantiating the amounts of claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. In certain circumstances the burden of proof on factual issues may shift to the Commissioner. See sec. 7491(a); Rule 142(a)(1). Petitioner does not contend that this provision applies here, and he thus bears the burden of proof.

I.     Governing Statutory and Regulatory Framework

Section 1366(a)(1) generally provides that the shareholders of an S corporation are taxed currently on its items of income, losses, deductions, and credits, regardless of actual distributions. However, section 1366(d)(1) provides that the amount of losses and deductions taken into account by the shareholder may not exceed the sum of: (1) the adjusted basis of the shareholder's stock in the S corporation and (2) the adjusted basis of any indebtedness of the S corporation to the shareholder. Any disallowed loss or deduction is treated as incurred by the corporation in the succeeding taxable year with respect to the shareholder whose loss-

[*9] es and deductions are limited. Sec. 1366(d)(2)(A). Once the shareholder increases his basis in the corporation, any losses or deductions previously suspended become available to the extent of the basis increase.

The Code does not specify how a shareholder may acquire basis in an S corporation's indebtedness to him. The legislative history of the predecessor to section 1366 states that losses are limited "to the adjusted basis of the shareholder's investment in the corporation." S. Rept. No. 85-1983 (1958), 1958-3 C.B. 922, 1141. We have construed "investment" for purposes of section 1366(d)(1)(B) to mean an "actual economic outlay" by the shareholder. Hitchins v. Commissioner, 103 T.C. 711, 715 (1994). A taxpayer makes an economic outlay sufficient to acquire basis in an S corporation's indebtedness when he "incurs a 'cost' on a loan or is left poorer in a material sense after the transaction." Broz v. Commissioner, 137 T.C. 46, 60-61 (2011), aff'd, 727 F.3d 621 (6th Cir. 2013). The taxpayer bears the burden of establishing his basis. See id. at 60.

Petitioner contends that a regulation promulgated in 2014 applies to the transactions at issue in this case, with the supposed result that he need not show an "actual economic outlay" in order to obtain increased basis in Merco. Respondent concedes that these regulations apply to at least some of the transactions in question. But he contends that petitioner's interpretation of the regulation is flawed.

[*10] The Secretary proposed section 1.1366-2(a)(2)(i), Income Tax Regs., in 2012, 77 Fed. Reg. 34886 (June 12, 2012), and finalized the regulation in 2014, T.D. 9682, 2014-33 I.R.B. 342, 345. The final regulation provides:

> The term basis of any indebtedness of the S corporation to the shareholder means the shareholder's adjusted basis * * * in any bona fide indebtedness of the S corporation that runs directly to the shareholder. Whether indebtedness is bona fide indebtedness to a shareholder is determined under general Federal tax principles and depends upon all of the facts and circumstances.

The Secretary has provided that "S corporations and their shareholders may rely on § 1.1366-2(a)(2) with respect to indebtedness * * * result[ing] from any transaction that occurred in a year for which the period of limitations on the assessment of tax has not expired before July 23, 2014." Section 1.1366-5(b), Income Tax Regs. Petitioner professes reliance on the new regulation, and the period of limitations on assessment has not expired as to the 2005 and 2008 tax years at issue. See sec. 6213(a). On the other hand, many of the inter-company transactions on which petitioner relies to generate his basis occurred during 2004, 2006, and 2007, and the periods of limitations on assessment for those years appear to have expired long before July 23, 2014. It is not clear how the new regulation would apply in these circumstances.

[*11] In our view, it does not matter whether (or to what extent) the new regulation applies because the outcome would be the same in either event. The test set forth in the new regulation--limiting basis to "bona fide indebtedness of the S corporation that runs directly to the shareholder"--is the same test set forth in prior case law. See, e.g., Hitchins, 103 T.C. at 715 ("[T]he indebtedness of the S corporation must run directly to the shareholders[.]"); Prashker v. Commissioner, 59 T.C. 172, 176 (1972) ("Clearly there must be a debt running directly to the shareholder in order to permit the deduction * * * of a corporate net operating loss.").

Moreover, the new regulation provides that the existence of bona fide indebtedness shall be determined "under general Federal tax principles." The "actual economic outlay" doctrine is a general tax principle that this Court has applied, in cases too numerous to mention, to determine whether a shareholder has made a bona fide loan that gives rise to an actual investment in the corporation. See, e.g., Hitchins, 103 T.C. at 715; Ruckriegel v. Commissioner, T.C. Memo. 2006-78, 91 T.C.M. (CCH) 1035, 1040; Oren v. Commissioner, T.C. Memo. 2002-172, 84 T.C.M. (CCH) 50, 57, aff'd, 357 F.3d 854 (8th Cir. 2004). And principles developed in other tax contexts, requiring that a corporation's indebtedness to a shareholder be genuine and reflect economic reality, apply with equal force for purposes of section 1366(d)(1). See, e.g., Geftman v. Commissioner, 154 F.3d 61,

**[\*12]** 73 (3d Cir. 1998) (requiring "objective indicia of an obligation" to support the existence of indebtedness between related parties), <u>rev'g in part, vacating in part</u> T.C. Memo. 1996-447.

In short, the controlling test under prior case law, as under the new regulation, dictates that basis in an S corporation's debt requires proof of "bona fide indebtedness of the S corporation that runs directly to the shareholder." Sec. 1.1366-2(a)(2)(i), Income Tax Regs. Requiring that the shareholder have made an "actual economic outlay" is a general tax principle that may be employed under the new regulation, as it was applied under prior case law, to determine whether this test has been met. We therefore need not decide the precise extent to which the new regulation applies to the 2004-2008 transactions at issue.[4]

---

[4]We have previously recognized that the "actual economic outlay" doctrine is congruent with the new regulation. <u>See, e.g.</u>, <u>Phillips v. Commissioner</u>, T.C. Memo. 2017-61, at \*13-\*14 n.5. In support of a contrary conclusion, petitioner cites the following statement in the preamble to the 2012 proposed regulations: "These proposed regulations require that loan transactions represent bona fide indebtedness of the S corporation to the shareholder in order to increase basis of indebtedness; therefore, an S corporation shareholder need not otherwise satisfy the 'actual economic outlay' doctrine for purposes of section 1366(d)(1)(B)." 77 Fed. Reg. 34885 (July 2, 2012). But in stating that a shareholder "need not otherwise" satisfy the actual economic outlay doctrine, the preamble indicates that the doctrine is relevant in ascertaining whether "loan transactions represent bona fide indebtedness of the S corporation to the shareholder." In any event, we "never have understood the preamble to proposed regulations to be precedential." <u>Dobin v. Commissioner</u>, 73 T.C. 1121, 1127 n.9 (1980).

[*13] II.    Analysis

Petitioner advances two theories to support his claim to basis beyond the amount respondent has allowed.  His first argument is that the Merco affiliates lent money to him and that he subsequently lent these funds to Merco.  He refers to this as the "back-to-back" loan theory.  His second argument is that he lent money to the Merco affiliates and that they used these funds to pay Merco's expenses.  He refers to this as the "incorporated pocketbook" theory.  We examine these arguments in turn.

A.    Back-to-Back Loan Theory

Petitioner first contends that transactions among the Merco affiliates should be recast as loans to the shareholders (including himself) from the creditor companies, followed by loans from the shareholders (including himself) to Merco.  The regulations recognize that back-to-back loans, if representing bona fide indebtedness from the S corporation to the shareholder, can give rise to increased basis.  See sec. 1.1366-2(a)(2)(iii), Example (2), Income Tax Regs.

As noted previously, "the indebtedness of the S corporation must run directly to the shareholder[]" in order to create shareholder basis.  Hitchins, 103 T.C. at 715; sec. 1.1366-2(a)(2)(i), Income Tax Regs.  The corollary of this rule is that indebtedness of an S corporation running "to an entity with passthrough character-

**[\*14]** istics which advanced the funds and is closely related to the taxpayer does not satisfy the statutory requirements." Hitchins, 103 T.C. at 715. "[T]ransfers between related parties are examined with special scrutiny," and taxpayers "bear a heavy burden of demonstrating that the substance of the transactions differs from their form." Ruckriegel, 91 T.C.M. (CCH) at 1040.

For example, in Shebester v. Commissioner, we rejected the taxpayer's contention that loans from one controlled S corporation (S1) to another controlled S corporation (S2) were in substance a series of dividends to the shareholder from S1, followed by loans from the shareholder to S2. T.C. Memo. 1987-246, 53 T.C.M. (CCH) 824, 826 (ruling that the taxpayer may not "easily disavow the form of this transaction"). Similarly, in Burnstein v. Commissioner, we upheld the transactional form originally selected by the taxpayer and gave no weight to an end-of-year reclassification of inter-company loans as shareholder loans. T.C. Memo. 1984-74, 47 T.C.M. (CCH) 1100, 1105; see also Meisner v. Commissioner, T.C. Memo. 1995-191, 69 T.C.M. (CCH) 2505, 2507.

These authorities dictate that petitioner's "back-to-back loan" argument must be rejected on the facts here. First, no loan transactions were contemporaneously documented. The $5,014,965 transferred to Merco in March 2004 was apparently booked as a capital contribution by Akoya. The $623,860 paid by a

[*15] Merco affiliate as common paymaster was booked as the payment of Merco's wage expenses. And the $10,513,808 of net inter-company transfers reflected hundreds of accounts payable and accounts receivable, which went up and down depending on the various entities' cash needs. These inter-company accounts were recharacterized as loans to shareholders only after the end of each year, when Mr. Carreras prepared the tax returns and adjusted Merco's book entries to match the "shareholder loans" shown on those returns. None of these transactions was contemporaneously booked as a loan from shareholders, and petitioner has not borne the "heavy burden of demonstrating that the substance of the transaction[s] differs from their form." Ruckriegel, 91 T.C.M. (CCH) at 1040.

Second, even if we were to treat these transactions as loans, Merco's indebtedness ran to its affiliates, not directly to petitioner. See Prashker, 59 T.C. at 176. The $5,014,965 that Akoya contributed to Merco moved from one controlled company to another, without affecting petitioner's economic position in any way. The same was true for the $623,860 of Merco wage expenses that an affiliate, in its capacity as common paymaster, paid on Merco's behalf. And the same was true for the $10,513,808 of net inter-company payments, which Merco uniformly booked as accounts payable to its affiliates. The affiliates advanced these funds to Merco, not to petitioner. And to the extent Merco repaid its affiliates' advances--it made

[*16] payments in excess of $5 million during 2004-2008--it made the payments to its affiliates, not to petitioner.

There is simply no evidence that Merco and its affiliates, when booking these transactions, intended to create loans to or from petitioner.[5]  Mr. Carreras' adjustments to a notional line of credit, uniformly made after the close of each relevant tax year, do not suffice to create indebtedness to petitioner where none in fact existed.  See Delta Plastics v. Commissioner, 54 T.C. 1287, 1291 (1970) (disregarding promissory note that did not reflect an "intent by both parties, substantially contemporaneous to the time of such transfer, to establish an enforceable obligation of repayment"); Parson v. Commissioner, T.C. Memo. 1974-183, 33 T.C.M. (CCH) 789 (finding no indebtedness to common shareholder of multiple S corporations, which had loaned each other money, until such time as the shareholder himself repaid the advances), aff'd without published opinion, 554 F.2d 1070 (9th Cir. 1977).

As noted earlier, a taxpayer in this setting may not "easily disavow the form of th[e] transaction" he has chosen.  Shebester, 53 T.C.M. (CCH) at 826.  The

---

[5]There may have been non-tax reasons, including restrictive covenants binding the Merco affiliates, that would have prevented them from making loans in excess of $10 million to petitioner without securing them with any collateral.  Petitioner submitted no evidence on this point.

[*17] transactions at issue took the form of transfers among various Merco affiliates, and we find that petitioner has not carried his burden of proving that the substance of the transactions differed from their form. See Meissner, 69 T.C.M. (CCH) at 2507 ("[W]e have consistently held that taxpayers are generally constrained to be taxed in the same form in which they have chosen to operate."). Unlike the $4,985,035 that petitioner initially borrowed and contributed to Merco, he made no "actual economic outlay" toward any of the advances that Merco's affiliates extended to it. See Hitchins, 103 T.C. at 715. We accordingly find, on the basis of all the facts and circumstances, that none of the inter-company transactions mentioned above gave rise to bona fide indebtedness from Merco to petitioner under his back-to-back loan theory.[6]

B.      Incorporated Pocketbook Theory

Petitioner alternatively contends that he used the Merco affiliates as an "incorporated pocketbook" to pay Merco's expenses on his behalf. Where a taxpayer

---

[6]Petitioner errs in relying on Scott Singer Installations, Inc. v. Commissioner, T.C. Memo. 2016-161, 112 T.C.M. (CCH) 257. That was a worker classification case in which we had to decide whether certain transactions were properly characterized as the payment of wages or the repayment of loans. Id. at 258. Here, it is undisputed that transactions among the Merco affiliates gave rise to extensions of credit in the form of net accounts payable by Merco. The central question is whether this indebtedness ran to the Merco affiliates or petitioner, and Scott Singer Installations sheds no light on the proper resolution of that question.

[*18] uses a related entity as an "incorporated pocketbook," we have held that payments from that entity to the taxpayer's S corporation may constitute payments on the taxpayer's behalf and thus give rise to increased basis. See Yates v. Commissioner, T.C. Memo. 2001-280, 82 T.C.M. (CCH) 805; Culnen v. Commissioner, T.C. Memo. 2000-139, 79 T.C.M (CCH) 1933, rev'd on other grounds, 28 F. App'x 116 (3d Cir. 2002). For an "incorporated pocketbook" to exist, the taxpayer must establish that he had a "habitual practice of having his wholly owned corporation pay money to third parties on his behalf." Broz, 137 T.C. at 62; Ruckriegel, 91 T.C.M. (CCH) at 1041. Whether an entity functions as an "incorporated pocketbook" presents a question of fact. See Broz, 137 T.C. at 62.

The facts of this case are a far cry from those in Yates, supra, and Culnen, supra, upon which petitioner relies. First, in each of those cases the taxpayer was the sole shareholder of the corporation that he used to disburse funds on his behalf. Here, petitioner seeks to treat as his incorporated pocketbook 11 distinct Merco affiliates. Many of these companies had co-owners besides petitioner. And because the inter-company payments allegedly creating his basis involved netting hundreds of accounts payable against hundreds of accounts receivable, petitioner is necessarily contending that his "incorporated pocketbook" not only disbursed

[*19] funds but regularly received them. We have never found an incorporated pocketbook on such facts.

Second, in Yates and Culnen each taxpayer established that he had the "habitual practice" of causing his wholly-owned company to pay his personal expenses. 82 T.C.M. (CCH) at 806; 79 T.C.M. (CCH) at 1937. Petitioner has made no such showing. Putting aside the basis-related transactions at issue, petitioner has not alleged or proven that the Merco affiliates "habitually or routinely paid * * * [his] expenses so as to make * * * [them] an incorporated pocketbook." Broz, 137 T.C. at 62; Messina v. Commissioner, T.C. Memo. 2017-213, at *33 ("Frequent and habitual payments are key to a finding that a corporation served as an incorporated pocketbook."); cf. Yates, 82 T.C.M. (CCH) at 806 (finding that the taxpayer had used his wholly owned corporation to pay his personal expenses over the course of several years).

Third, in Yates and Culnen each taxpayer actually disbursed his own funds through the entity we found to be his incorporated pocketbook. 82 T.C.M. (CCH) at 807; 79 T.C.M. (CCH) at 1937. Petitioner did not do this; all of the funds in question were disbursed by Merco affiliates to or on behalf of Merco. Petitioner made no "actual economic outlay," Hitchins, 103 T.C. at 715, and he was at best a third-party beneficiary of these transfers.

**[*20]** Finally, in <u>Yates</u> and <u>Culnen</u> the transactions alleged to create basis were actually booked as loans. The corporations contemporaneously recorded shareholder loans on their ledgers, and payments of principal and interest were made on the loans. <u>Yates</u>, 82 T.C.M. (CCH) at 806-807; <u>Culnen</u>, 79 T.C.M. (CCH) at 1934-1935. Here, by contrast, the transactions were contemporaneously booked as capital contributions, payroll expenses, or inter-company accounts payable and receivable. Merco's net accounts payable to affiliates were recharacterized as "shareholder loans" only after the close of each year, when Mr. Carerras prepared the tax returns and adjusted Merco's book entries to match. No payments of principal or interest were ever made on these supposed "shareholder loans." <u>See</u> <u>Broz</u>, 137 T.C. at 52-53 (rejecting incorporated pocketbook theory where corporation made year-end adjustments reclassifying advances as shareholder loans); <u>Wilson v. Commissioner</u>, T.C. Memo. 1991-544 (rejecting reclassification of transactions on the basis of year-end journal entries).

For these reasons, we find that petitioner has not carried his burden of proving that he used the 11 Merco affiliates as an "incorporated pocketbook" to pay Merco's expenses. Under this theory, as under his back-to-back loan theory, petitioner seeks to disavow the form of inter-company extensions of credit in an effort

[*21] to generate basis for himself.[7]  Because petitioner has not established the existence of bona fide indebtedness running from Merco directly to him, he is not entitled to the increased basis he claims.  Hitchins, 103 T.C. at 715; sec. 1.1366-2(a)(2)(i), Income Tax Regs.  We accordingly conclude that respondent properly reduced petitioner's allowable NOL carryback to 2005.

To reflect the foregoing,

Decision will be entered for

respondent.

---

[7]Petitioner errs in seeking to accomplish the same result by invoking the doctrine of "constructive receipt."  See sec. 1.451-2(a), Income Tax Regs.  This doctrine addresses a timing issue, viz., whether an item of income is includible in a taxpayer's gross income regardless of actual receipt.  It has no conceivable relevance in determining whether a taxpayer has made an actual economic outlay sufficient to create increased basis in the stock or indebtedness of an S corporation.